**GULF ATLANTIC LIFE INSURANCE COMPANY, et al., Appellants,**

v.

**C. Daniel HURLBUT and A.C. Hovater, Appellees.**

No. 05–81–01363–CV.

Court of Appeals of Texas, Dallas.

June 14, 1985.

Rehearing Denied Aug. 21, 1985.

R. Vernon Coe, R.B. Cousins, Thompson, Coe, Cousins & Irons, Royal H. Brin, Jr., Strasburger & Price, Dallas, David Maynard, Wagner, Schmidt, McCutchan, Hank & Birkhimer, Columbus, Ohio, for appellants.

G.H. Kelsoe, Jr., Kelsoe & Kelsoe, R. Jack Ayres, Jr., Dallas, for appellees.

Before GUITTARD, C.J., and AKIN and STEPHENS, JJ.

GUITTARD, Chief Justice.

Insurance agents C. Daniel Hurlbut and A.C. Hovater sued their former employer, Gulf Atlantic Life Insurance Company, its parent corporation, and several corporate officers for fraud, business disparagement, and tortious interference with contract rights. The trial court rendered judgment for actual and exemplary damages against all defendants. On this appeal defendants contend that all claims asserted are barred by limitation as a matter of law. We

agree. We also hold that no action lies for defendants' alleged false statements to an assistant Texas attorney general and the Texas Board of Insurance Commissioners (hereinafter referred to as the Insurance Board) in response to an investigation into possible violations of the insurance laws in the absence of a claim for malicious prosecution. Accordingly, we reverse and render judgment that plaintiffs take nothing.

## FACTUAL BACKGROUND

Both plaintiffs had an insurance agent's license and a local recording agent's license from the Insurance Board. Also, both plaintiffs were agents for defendant Gulf Atlantic Life Insurance Company before the events leading to the present suit occurred. Plaintiff Hurlbut had been a regional manager for Gulf Atlantic in Houston. Plaintiff Hovater had been an independent insurance agent with experience in mass-marketing of individual cancer insurance, life insurance, and accidental death and disability policies to groups of employees. Hovater had a letter of introduction from the Southern Regional School District Association, which gave him access to groups of school employees. Hovater began representing Gulf Atlantic as an agent early in 1974.

In April 1974 a meeting was held in Gulf Atlantic's Dallas office between plaintiffs and the individual defendants. Those Gulf Atlantic employees present included defendant William Barnes, president; defendant Earl Smith, secretary; defendant Ralph Curtis, vice president for marketing; defendant Kenneth Thompson, agency vice president; and defendant Harold W. Watson, director of mass marketing. Also present was defendant Jack Warner, vice president for marketing of defendant Nationwide Corporation, the corporate parent of Gulf Atlantic. At this meeting it was proposed that Hurlbut and Hovater join their efforts in an association to be known as "Agency Associates" for promotion of mass marketing of Gulf Atlantic's insurance policies. According to defendants, the discussion was confined to mass marketing of individual cancer, life, and accidental death and disability insurance policies, chiefly to groups of school employees to whom Hovater had access by his letter of introduction from the Southern Regional School District Association. According to plaintiffs, there was also a discussion of group health insurance policies to be marketed on a trust plan by which several small groups of employees could combine to obtain one group health insurance policy. According to this arrangement, a bank would act as trustee, plaintiffs would act as administrators, and Gulf Atlantic would underwrite the plan and issue a group health insurance policy to cover all the employees of the participating groups. Plaintiffs would then sell this group health insurance program to various school districts and other agencies or groups. Plaintiffs would also collect the premiums, deposit them in the trust account, deduct commissions and expenses (including claims), and pay over any balance to Gulf Atlantic. Defendant Warner acknowledged that he was familiar with such arrangements, and he agreed to send sample trust documents to plaintiffs for their use. Defendant Barnes, president of Gulf Atlantic, instructed plaintiffs to work through defendant Thompson, Gulf Atlantic's agency vice president, to establish this program.

After this meeting, plaintiffs set up an agency office in Houston with funds advanced by Gulf Atlantic. They employed as bookkeeper and office manager Roy Bengel, who had experience in this type of business. With Bengel, plaintiffs formulated a schedule of rates and benefits and prepared various forms to be used in presenting this group health insurance program. Defendant Warner sent plaintiffs copies of one or more trust agreements used in similar group insurance programs. Plaintiff Hovater inquired of defendant Thompson concerning an attorney to prepare the proposed trust document and Thompson referred him to Ira Allen, a Dallas lawyer. Accordingly, plaintiffs sent Bengel to Dallas and to meet with Allen in June 1974. Bengel gave Allen a proposed typewritten trust 'document designated

"National Health Group Insurance Trust," naming Franklin Bank of Houston as trustee. This was the bank with which defendants did business. Allen redrafted the document, making a number of changes, including a change of the name to "Nation-Wide Health Insurance Trust" and the addition of an individual trustee. There is no evidence in the record that this document was ever completed and delivered to Franklin Bank, the "named" trustee, to establish a trust account or to Gulf Atlantic as the basis for a master group policy, although plaintiffs testified that they signed it and relied on Allen to take care of it.

It is clear from the record that all of the parties knew that before Agency Associates could begin selling this group health insurance that: (1) a master policy had to be approved by the Insurance Board; (2) an insurance trust had to actually be established by Agency Associates; and (3) a licensed insurance company had to agree to underwrite the insurance program and actually issue the approved master policy to Agency Associates and the trustee. However, according to Hovater, Gulf Atlantic was anxious to start selling this program to school districts before school started in September 1974. In June or July of 1974 Thompson urged plaintiffs to "get some business going." Hovater testified that he assured Thompson they would do so "as soon as you give me the word," and Thompson then told him, "You have the word. Start selling." This is the statement that plaintiffs say they took as authorizing them to sell group health insurance for Gulf Atlantic through the Nation-Wide Health Insurance Trust.

When plaintiffs started selling, they knew that no master policy had been issued. Plaintiffs assert that they relied on Gulf Atlantic to file the master policy and obtain its approval by the Insurance Board. Hovater testified that when he inquired about Board approval, defendant Smith, secretary of Gulf Atlantic, whose duty it was to obtain the necessary approval of policy forms, gave him a copy of a proposed policy to be issued to the "West Texas Pipe Trades Health Insurance Trust" and stated that Agency Associates' policy would be "virtually identical." According to Hurlbut, Smith assured him and Hovater that they need not worry about the master policy because getting it approved and issued was just a matter of "paperwork" as it was identical to a policy that Gulf Atlantic was already using for other trusts with no problems. Both plaintiffs testified that they made weekly inquiries to Thompson concerning the status of the master policy and that he assured them that everything was in order. Furthermore, according to Bengel, plaintiffs' bookkeeper, all promotional materials, including a schedule of rates and benefits, were examined and approved by Thompson before printing. Relying on these assurances and approvals, plaintiffs began selling group health insurance under the Nation-Wide Health Insurance Trust in August 1974 and continued to do so until January 1975. Plaintiffs sold this insurance even though they had not even established a Nation-Wide Health Insurance Trust bank account. In addition, plaintiffs collected premiums, but they did not deposit them in a trust account, as none had been established; they deposited them in Agency Associates' checking account. Bengel prepared monthly statements of the premiums collected which, he testified, he sent regularly to Thompson in Dallas. When plaintiffs contacted school representatives and others in their sales program, they responded to any inquiry concerning their authority to sell the program by suggesting that such inquiries be directed to defendant Barnes in Dallas.

The program proceeded in this manner through December 1974. Despite Thompson's repeated assurances, no master policy was ever furnished. In late December Wayne Holder, city attorney of Freeport, Texas, made a telephone call to Barnes inquiring about the master policy. Holder testified that both Barnes and Thompson told him that Gulf Atlantic was not underwriting the Nation-Wide Health Insurance program. Holder reported this information to Hurlbut and also to Texas Attorney Gen-

eral John Hill, who assigned his assistant, Bill Flanary, to investigate. At the suggestion of defendant Warner, plaintiffs met with Barnes, Thompson, and others in Barnes' office on January 21, 1975. There plaintiffs were surprised by the appearance of Flanary, who asked Barnes whether plaintiffs had authority to write group insurance for Gulf Atlantic through a trust plan. Barnes replied that they did not.

At Flanary's request, plaintiffs accompanied him to a local office of the Attorney General in Dallas and cooperated in the investigation. Flanary immediately filed suit in the district court of Brazoria County for a temporary injunction restraining plaintiffs from selling group health insurance under the Nation-Wide Health Insurance Trust and for a receivership of Agency Associates. Plaintiffs signed an agreed order granting the injunction and authorizing the receiver to take over their assets. Also, a proceeding was begun before the Board of Insurance Commissioners, which issued an order revoking their licenses on the ground of their selling unapproved insurance. There is no evidence of who initiated these proceedings. Both plaintiffs were indicted by the grand jury in Harris County for misapplication of premium funds paid to them by the Pasadena Independent School District. There is no evidence of who initiated these criminal charges. These indictments were dismissed on the ground that these charges amounted to double jeopardy because of the earlier proceedings to revoke their licenses.

Plaintiffs' petition alleges that they sustained damages to their reputation because of the receivership, the license revocations, the criminal prosecutions, and the attendant publicity. Both plaintiffs testified about substantial damages in these respects.

### FRAUD

The evidence varies substantially from the fraud asserted in Plaintiffs' petition, which alleges that at the time of the original meeting in Dallas in April 1974 defend-

ants "engaged in a conspiracy to increase business and take advantage of the relationship which plaintiffs had with the many school districts in the central and southern part of the United States." They alleged various "overt acts" done in furtherance of this conspiracy, and specified various "causes of action" based on these acts. With respect to fraud, the petition alleges:

a. Fraud, in that misrepresentations were made by the Defendants to induce the Plaintiffs to enter into the establishment of a general agency (Agency Associates) for the purpose of writing an insurance trust to various school districts and other multiple employers, and advising plaintiffs that they should now proceed to issue said policies in late Summer or early Fall of 1974 and but for these fraudulent misrepresentations of the Defendants, Plaintiffs would not have issued said policies to their damage and detriment as herein alleged.

At the trial, plaintiffs presented no evidence of a conspiracy formed in April 1974 to defraud them by taking advantage of their relationship with the school districts. Plaintiffs testified that all parties appeared enthusiastic about the program at this original meeting. So far as the evidence shows, defendants remained committed to the program until difficulties developed several months later.

At most, the evidence shows the following. Defendant Thompson told plaintiffs to "start selling" insurance under the proposed Nation-Wide Health Insurance trust in July or August 1974 when Gulf Atlantic had no master policy filed and approved by the Insurance Board. Gulf Atlantic failed to get such a master policy approved; therefore, it was unable to furnish a master policy to plaintiffs. Then, when Holder made inquiry of Barnes about the master policy for the city of Freeport and, again, when the assistant attorney general undertook his investigation, Barnes and the other defendants denied that they had ever authorized plaintiffs to sell group health insurance through a trust plan for Gulf Atlantic. This denial left plaintiffs in the

position of having sold unauthorized insurance, contrary to the Insurance Code and, consequently, exposed them to an investigation by the attorney general that resulted in receivership proceedings, revocation of their licenses, and criminal prosecution for misapplication of premium funds.

In answer to special issues, the jury found that each of the defendants "fraudulently represented to plaintiffs that plaintiffs were authorized to write group health insurance through a trust arrangement to be underwritten by Gulf Atlantic Life Insurance Company." The jury further found that this fraudulent representation was a proximate cause of damages or loss to plaintiffs. The jury also found that each of the defendants entered into a conspiracy to defraud plaintiffs by making such representations and that this conspiracy was a proximate cause of plaintiffs' damages. The jury answered "we do not" in response to special issue number 27:

> Do you find from a preponderance of the evidence that Plaintiffs knew or by the exercise of ordinary care should have known of the fraud, if any, of the Defendants on or before January 20, 1975?

Since the suit was filed January 21, 1977, an affirmative answer to this issue would have barred recovery on the fraud claim under the two-year statute of limitations. In the trial court, defendants moved for judgment in their favor notwithstanding this finding on the ground that the evidence established as a matter of law that plaintiffs knew or should have known of the fraud on or before January 20, 1975. They urge that contention again on this appeal.

■ The law is well settled that a cause of action for fraud accrues when the plaintiff discovers the fraud or has knowledge of facts which would cause a reasonably prudent person to make inquiry that would lead to discovery of the fraud. Knowledge of such facts is in law knowledge of the fraud itself. *White v. Bond*, 362 S.W.2d 295 (Tex.1962); *Glenn v. Steele*, 141 Tex. 565, 61 S.W.2d 810 (1933). Accordingly, we review the pleadings and evidence to determine what facts were within plaintiffs' knowledge on or before January 20, 1975.

According to the petition, the representation that plaintiffs "should now proceed to issue said policies" on which plaintiffs relied was made "in late Summer or early Fall of 1974." Hurlbut testified that this representation was made in June or July. Plaintiffs rely on this statement as a representation that they were authorized to go ahead with their marketing activities for the Nation-Wide Health Insurance Trust. These activities began in August 1974. It is undisputed, however, that in December or early January 1975 plaintiffs knew that they were not authorized to write insurance for Gulf Atlantic in August and, therefore, that defendants' initial representations were false. Their petition expressly alleges:

> It was not until the *latter part of 1974* when *Plaintiffs learned* for the first time that, in truth and in fact, *Gulf Atlantic had not underwritten said program and that* the *policies of insurance which had been sold through the insurance trusts to various school districts were improper and wrong*. Even after a letter was received in November, 1974 from Ira Allen and contact had been made with the Defendant Thompson of Gulf Atlantic, Gulf Atlantic was still assuring the Plaintiffs that it was all right to proceed with the writing of said insurance and that Gulf Atlantic had the "muscle" in Austin, through its attorneys, to take care of any questions that might arise. Plaintiffs, as insurance men, knew that said policies had to be approved by the State, but since it is the normal function of the insurance company to approve said policies, Plaintiffs believed that said policies had been so approved. The approval of said policies was a matter within the total control of the Defendants; and, therefore, Plaintiffs felt justified in relying upon said representation. [Emphasis added.]

■ We conclude that this allegation that plaintiffs learned late in 1974 that Gulf Atlantic had not underwritten the pro-

gram and that the policies they had sold were "improper and wrong" is not taken out of context, as plaintiffs insist. It is deliberate, clear, and unequivocal, and it has not been abandoned or amended. Consequently, it is a judicial admission binding on plaintiffs and precludes them from introducing evidence to the contrary. *Johnson v. Johnson*, 579 S.W.2d 30, 31 (Tex.Civ. App.—Beaumont 1979, no writ); *see also Kirk v. Head*, 137 Tex. 44, 152 S.W.2d 726, 729 (1941) (Pleadings on which case is tried are judicial admissions.).

Actually, this allegation is entirely consistent with plaintiffs' evidence as presented. Plaintiffs made no attempt to prove that they did not discover, before January 21, 1975, their lack of authority to sell group health insurance for Gulf Atlantic in August 1974. They insisted, rather, that they relied on defendants' repeated assurances that the necessary filing would *later* be made with the Insurance Board and that the master policy would eventually be issued. Thus we find nothing in the evidence that would explain or avoid the effect of the quoted admission in plaintiffs' petition.

■ On this appeal defendants contend, as they did in the trial court, that they are entitled to judgment notwithstanding the jury's answer to special issue number 27 because the evidence shows as a matter of law that plaintiffs knew or should have known before January 1, 1975, that defendants had made false representations to them concerning their authority to sell group health insurance for Gulf Atlantic. We agree. Taking the evidence most strongly in plaintiffs' favor,[1] the most that it shows is that after plaintiffs discovered they had been selling group health insurance without proper authority, they relied on further assurances by defendants that the problem would be straightened out and that the necessary authority would eventually be obtained. However, when one discovers that a representation on which he

has relied to his detriment is false, reliance on further representations of the same sort by the fraudfeasor will not postpone the running of limitations. *Stafford v. Wilkinson*, 157 Tex. 483, 304 S.W.2d 364, 366–67 (1957); *Phillips v. Baker*, 114 S.W.2d 421 (Tex.Civ.App.—San Antonio 1938, writ ref'd); *see also Frownfelter v. International Shoe Co.*, 273 F.2d 338, 339 (5th Cir.1960).

■ Plaintiffs contend that the evidence only raises a fact issue as to whether plaintiffs "knew or should have known of the fraud" because of defendants' continued assurances that a master policy would be forthcoming. We cannot agree. Defendants' subsequent assurances, at most, would raise an issue as to whether defendants are estopped from pleading the statute of limitations in bar of this suit. Plaintiffs did not plead estoppel in the trial court, nor did they request a special issue presenting to the jury this ground for avoiding the bar of the statute. Consequently, plaintiffs have waived this issue. Furthermore, because the individual defendants in their testimony denied giving the assurances on which plaintiffs allegedly relied, estoppel cannot be established as a matter of law.

■ We recognize that where the discovery rule is applicable, as in suits for fraud, and the petition does not affirmatively show that the cause of action accrued more than two years before the suit was filed, the defendant has the burden of establishing that the cause of action accrued at such a time as to be barred by limitation. *Whatley v. National Bank of Commerce*, 555 S.W.2d 500, 505 (Tex.Civ. App.—Dallas 1977, no writ). However, where, as here, the petition shows on its face that the cause of action accrued more than two years before the suit was filed, the plaintiff has the burden to establish estoppel in avoidance of the affirmative defense of limitation. *Cook v. Smith*, 673

---

1. Plaintiffs' evidence on this issue is summarized in detail in an unpublished supplement to this opinion.

S.W.2d 232, 235 (Tex.App.—Dallas 1984, writ ref'd n.r.e.).

■ The same rule applies when the limitation defense is not raised by the petition, but is established by the evidence as a matter of law and the plaintiff seeks to interpose an estoppel to avoid the limitation defense. *Nichols v. Smith*, 507 S.W.2d 518, 521 (Tex.1974); *see also Oram v. General American Oil Co.*, 513 S.W.2d 533, 534 (Tex.1974). Regardless of whether the present petition affirmatively shows on its face that plaintiffs' cause of action accrued before the end of 1974, we hold that the evidence establishes the limitation defense as a matter of law. In order to avoid the limitation defense because of defendants' subsequent assurances, plaintiffs had the burden to request and secure a favorable finding on the issue of estoppel. *Irwin v. Prestressed Structures, Inc.*, 471 S.W.2d 865, 867 (Tex.Civ.App.—Eastland 1971, writ ref'd n.r.e.); *Reliance Electric & Engineering Co. v. Carrier—Houston Corp.*, 445 S.W.2d 48, 50–51 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.).

■ This distinction between application of the discovery rule and avoidance of the limitation defense by estoppel to plead limitation was also recognized in *Borderlon v. Peck*, 661 S.W.2d 907, 908–09 (Tex.1983), in which the supreme court held that a statute abolishing the discovery rule with respect to certain types of medical malpractice did not prevent a plaintiff from avoiding the bar of limitation by pleading and proving facts raising fraudulent concealment as an estoppel against the limitation defense. Thus, in the present case, plaintiffs' reliance on defendants' subsequent assurances may have raised an estoppel, but did not negate their actual discovery of the fraud.

For these reasons, we sustain defendants' third point, which asserts that the jury's answer to special issue number 27 should be disregarded, and hold that the evidence establishes as a matter of law that plaintiffs knew or should have known of the falsity of defendants' representa-tions more than two years before the suit was filed.

## BUSINESS DISPARAGEMENT

### (1) One-Year Statute of Limitations

Defendants contend that the trial court erred in failing to disregard the jury's answers to the issues submitting plaintiffs' theories of business disparagement and tortious interference with contract rights because these claims, having their basis in defamatory utterances, are barred by the one-year statute of limitations, TEX.REV. CIV.STAT.ANN. art. 5524(1) (Vernon 1958). This statute requires that actions "for injuries done to the character or reputation of another by libel or slander" be commenced and prosecuted within one year after the cause of action has accrued. The parties stipulated that any claim by plaintiffs for libel or slander is barred by article 5524(1). Accordingly, we must determine whether the claims as pleaded and proved should properly be regarded as claims for libel or slander.

We conclude that plaintiffs' disparagement claim is in its essence a claim for slander. The petition alleges that in April 1974 defendants agreed with plaintiffs to engage in mass marketing of group health insurance through an insurance trust program to school districts and other groups of employees and that plaintiffs proceeded to market this program in accordance with defendants' instructions, but that defendants failed to file the master policy underwriting the program with the Insurance Board and gave false information to the Board and to the Attorney General to the effect that defendants were not involved in this insurance trust program. Plaintiffs alleged that this false information caused plaintiffs' insurance licenses to be revoked and that, by intentionally presenting false evidence to the Attorney General and the grand jury, defendants caused indictments to be returned against plaintiffs, knowing that such false evidence would lead to plaintiffs' arrest on criminal charges. The petition alleges further that by virtue of

defendants' conspiracy to give this false information, plaintiffs:

> have been held up to public ridicule and contempt, have been branded as common criminals, have had their insurance licenses revoked, are unable to secure any type of job which would pay them commensurate with their ability and experience, have suffered severe and extreme hardship in the support of their families, and are unable to practice their profession as licensed insurance agents.

On the basis of these allegations, plaintiffs assert various causes of action, including "[d]isparagement of each of the Plaintiffs' trade and calling ... in that Defendants, as hereinabove alleged, have disparaged the abilities and reputations of each of the Plaintiffs causing them to lose their licenses." The petition alleges that each plaintiff is entitled to recover "actual damages for loss of earnings, injury to their reputation, emotional distress, damages from the tortious interference of the contracts, and loss of property" in the sum of $1,200,000.

Defendants pleaded "that plaintiffs' causes of action are barred by limitation as respect their entire cause of action." They specifically pleaded the one-year statute, article 5524, "as respects the claim of slander."

The only false statements alleged in the petition as a basis for the damages claimed are those alleged to have been made to the Attorney General and the Board of Insurance Commissioners. At trial plaintiffs introduced evidence that Wayne Holder, city attorney of the city of Freeport, made a complaint to the Attorney General and to the Board of Insurance Commissioners concerning plaintiffs' failure to produce a master policy evidencing Gulf Atlantic's underwriting of group health insurance for the employees of the city. As a result of this complaint, Bill Flanary, an assistant attorney general, undertook an investigation, and in the course of this investigation met with plaintiffs and some of the defendants in the offices of Gulf Atlantic in Dallas on January 21, 1975. At this meeting defendant Barnes told Flanary that plaintiffs had no authority to write group health insurance for Gulf Atlantic through a trust plan. Also, the record contains a sworn statement given by Barnes in February 1975 to Flanary and another assistant attorney general in which Barnes states that he knew nothing about the proposed Nation-Wide Health Insurance Trust until late December 1974 and that he had never approved any group health insurance for plaintiffs or any group to whom plaintiffs had purported to sell such insurance. There is no evidence that any of defendants testified before the Insurance Board or the grand jury in Harris County.

The record does show that immediately after the meeting on January 21, Flanary filed suit in the district court of Brazoria County asking for the appointment of a receiver to take over all of plaintiffs' assets and that plaintiffs signed an agreed order granting this relief. The receiver so appointed later turned all these assets over to the liquidator for the Insurance Board, who applied them to payment of claims against the Nation-Wide Health Insurance Trust. The record also shows that the Insurance Board revoked plaintiffs' licenses on the ground that they were selling unapproved insurance, but does not reveal the evidence presented to the Board as a basis for that action. The indictment under which Hurlbut was arrested charges him with "misapplication of Fiduciary Property." Specifically, this indictment alleges that Hurlbut misapplied premium payments made to him by the Pasadena Independent School District. The indictment under which Hovater was arrested charges him with "theft" of money, presumably premium payments, from the Pasadena Independent School District. There is no evidence in the record to indicate who made the complaints resulting in these indictments.

All of plaintiffs' evidence of damages relates to the results of the receivership, the loss of their licenses, their indictment and imprisonment, and the attendant publicity. Plaintiffs testified that these actions destroyed their business and means of livelihood, alienated their friends, and

caused them humiliation, mental anguish, and loss of earnings. There was no proof of the value of their business or of any particular losses they sustained except that their income had fallen substantially below the $20,000 to $30,000 a year that each had earned as insurance agents before undertaking the group health insurance program for Gulf Atlantic. Plaintiffs had not been associated with each other before they made their arrangements with Gulf Atlantic. No attempt was made to show what commissions plaintiffs would have realized if the program had been carried forward under proper authority. Plaintiffs had purported to sell group health insurance for Gulf Atlantic for at least four months, yet no evidence was even offered to show what commissions would have been due them on the insurance they purported to write during these four months, what their net income would have been for that period, or, indeed, whether they would have realized any profits above expenses. The only evidence they presented was defendants' representations at the first meeting with plaintiffs that other agents had made $100,000 to $150,000 per year on similar programs and that plaintiffs would have the same "potential" after two or three years.

In charging the jury, the trial court defined the term "to disparage the trade or calling" as "the making of a statement concerning a person's services or business which is untrue and/or misleading which statement is made for the purpose of influencing other persons not to do business with or use or purchase Plaintiff's services." The jury found that each of the defendants entered into a conspiracy to disparage the trade or calling of plaintiffs and that this conspiracy was a proximate cause of damages or loss to plaintiffs. The jury further found that each of defendants individually disparaged the trade or calling of plaintiffs and that these acts were done with malice and were a proximate cause of damages or loss to plaintiffs. The damage issues inquired generally what sum would reasonably compensate each plaintiff "for his actual damages ... resulting from the events in question." In these issues the jury was instructed to consider "[l]oss of earnings, loss of earning capacity, effect on reputation and mental anguish." In argument to the jury, plaintiffs' counsel made no attempt to show by calculations based on any of the testimony what plaintiffs' actual pecuniary loss had been. Instead, they stressed the damages to plaintiffs' reputations resulting from the unfavorable newspaper publicity and plaintiffs' humiliation and mental anguish at being unable to care for their families in the manner to which they were accustomed. The jury answered all the issues in plaintiffs' favor and found actual damages of $1,200,000 in favor of each. Defendants moved for judgment notwithstanding the verdict on the ground, among others, that the disparagement claim was barred by the one-year statute of limitations applying to libel or slander. Defendants bring these contentions forward by appropriate points in their brief on this appeal.

■ We agree that the disparagement claim is barred by limitation. Clearly, Barnes' statements to Flanary were defamatory to plaintiffs' characters and reputations personally rather than merely disparaging to their business. Taken in context, these statements charge plaintiffs with fraud and the crime of selling unapproved insurance. In the light of Flanary's inquiry, Barnes' statement to Flanary that plaintiffs were not authorized to write group health insurance for Gulf Atlantic through a trust was equivalent to a charge that plaintiffs' activities were fraudulent and illegal, since Barnes knew that plaintiffs had been representing themselves as agents of Gulf Atlantic. The Insurance Code provides various criminal penalties that would have been applicable if Barnes' statement had been true. TEX.INS.CODE ANN. art. 21.15–3 & 21.15–5 (Vernon 1981). Article 21.15–3 imposes a criminal penalty on an agent who procures payment of an obligation for an insurance premium by fraudulent representations. Article 21.-15–5 provides that an agent who collects premiums for an insurance company lawfully doing business in this state and ap-

plies any money received by him contrary to the instructions or without the consent of the company for which the money was received shall be punished as if he had stolen it. Since Barnes knew that plaintiffs had collected premiums for policies to be issued by Gulf Atlantic through the Nation-Wide Health Insurance Trust, Barnes' statement that Gulf Atlantic had not authorized them to do so was equivalent to a charge of theft.

Such a charge was expressly characterized as defamatory by plaintiffs in their petition. Plaintiffs alleged that as a result of this false information plaintiffs "have been held up to public ridicule and contempt" and "have been branded as common criminals." A communication is defamatory if it tends to harm the reputation of another or to lower him in the estimation of the community or to deter third persons from associating or dealing with him. RESTATEMENT (SECOND) OF TORTS § 559 (1977). Actionable slander is defined to include several distinct categories of oral defamation, among which are false statements imputing to another the commission of a crime and those affecting another injuriously in his business, profession, or occupation. *Braugh v. Enyart*, 658 S.W.2d 221, 226 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); RESTATEMENT (SECOND) OF TORTS §§ 571, 573 (1977); *Prosser and Keeton on the Law of Torts* § 112 at 788–92 (W. Keeton 5th ed. 1984) [hereinafter cited as *Prosser and Keeton*]. Business disparagement, on the other hand, is a species of the tort of "injurious falsehood," which may cast no reflection on either the plaintiff's person or his property, but is maliciously uttered and, because of special circumstances, results in special damage. *Prosser and Keeton* § 128. The distinction between the two torts has been drawn in cases turning on the question of whether special harm must be shown and is explained by Prosser and Keeton as follows:

Although it is important to distinguish between personal defamation of the plaintiff on the one hand and disparagement of his property on the other, it is not always easy to do so. If the statement charges the plaintiff with personal misconduct, or imputes to him reprehensible personal characteristics, it is regarded as libel or slander.... On the other hand, if the aspersions reflect only upon the quality of what the plaintiff has to sell, or the character of his business as such, it is merely disparagement, and proof of damage has always been essential to the cause of action.... The difficulty in the distinction between the personal aspersion and the commercial disparagement lies in the fact that many statements effectuate both harms. It might be possible to imply some accusation of personal inefficiency or incompetence, at least, in nearly every imputation directed against a business or its product. The courts have gone to some lengths, however, in refusing to do so, particularily where the most that can be made out of the words is a charge of ignorance or negligence. Personal defamation is found only where the imputation fairly implied is that the plaintiff is dishonest or lacking in integrity, or that he is deliberately perpetrating a fraud upon the public by selling a product which he knows to be defective.

*Prosser and Keeton* § 128, at 964–65. *See also* RESTATEMENT (SECOND) OF TORTS § 623A comment *g* (1977); Hibschman, *Defamation or Disparagement*, 24 Minn.L.Rev. 625–34 (1940).

In Texas, the difference between defamation and business disparagement has been recognized by the courts. Thus the owner of a business may be libeled, but not the business itself. *Newspapers, Inc. v. Matthews*, 161 Tex. 284, 339 S.W.2d 890, 893 (1960). On the other hand, disparagement of a business or a property is actionable, though the injurious falsehood does not go far enough to constitute libel or slander. *Page v. Layne-Texas Co.*, 258 S.W.2d 366, 369 (Tex.Civ.App.—Galveston 1953, writ dism'd by agr.). Examples of such non-defamatory injurious falsehoods include publication of matter derogatory to the plaintiff's title to his property or to his business of a kind to prevent others from

dealing with him. *A.H. Belo Corp. v. Sanders,* 632 S.W.2d 145, 146 (Tex.1982) (slander of title); *Page,* 258 S.W.2d at 368–69 (impairment of contractor's credit resulting from false claim to bonding company); *Ward v. Gee,* 61 S.W.2d 555, 556–57 (Tex. Civ.App.—Eastland 1933, writ dism'd) (impairment of credit resulting from false claim of ownership of business); *Houston Chronicle Publishing Co. v. Martin,* 5 S.W.2d 170, 173–74 (Tex.Civ.App.—El Paso 1928, writ dism'd) (impairment of value of bulls resulting from a statement concerning foot and mouth disease); RESTATEMENT (SECOND) OF TORTS, §§ 623A, 624, 626 (1977); *Prosser and Keeton* § 128, at 967.

In distinguishing between personal defamation and disparagement of business, the type of damages claimed is significant. Libel or slander is actionable without proof of special damages; thus no specific economic loss need be proved. *Braugh,* 658 S.W.2d at 226. In business disparagement and other "injurious falsehood" claims, special damages are "the gist of the action," and neither damages to reputation nor consequential mental distress is recoverable. *Ward,* 61 S.W.2d at 556–57; RESTATEMENT (SECOND) OF TORTS, § 633 comment *j* (1977).

Difficulty arises in cases where both general damages to personal reputation and special damages to a particular business are alleged. The Restatement recognizes that although the two torts impinge on different interests, they may overlap in some fact situations, so that an action may be brought for both in the same suit so long as the damages are not duplicated. RESTATEMENT (SECOND) OF TORTS, § 673A Comment *g* (1977). When the suit does not purport to be brought for both, and one is barred by limitation, the court must decide which tort is claimed. This question must be determined from the factual allegations of the petition, the evidence adduced in support of these allegations, and the type of damages alleged and proved rather than merely from the use of the term "disparage" in the petition or in the court's charge. Otherwise, any plaintiff having a claim for oral defamation concerning his business practices, a well-recognized category of actionable slander, *Braugh,* 658 S.W.2d at 224, would be able to avoid the one-year statute of limitations by simply designating the defamatory statement "disparagement" rather than "slander."

A simple solution to this problem would be to apply the limitation statute governing libel or slander to the injurious falsehood whenever it is personally defamatory, as distinguished from one that injures only business or property interests. This approach has been adopted in New York, where it is held that false statements having a direct tendency to injure the plaintiff's reputation in his profession and business give rise only to a cause of action for slander. The New York court held that "a person possessing a cause of action in libel or slander may not avoid the statute of limitations applicable to such a cause of action by the device of claiming that the cause of action is an action on the case to which a longer statute of limitations is applicable." *Dubourcq v. Brouwer,* 124 N.Y.S.2d 61, 62 (Sup.Ct.1953), *aff'd,* 282 A.D. 861, 124 N.Y.S.2d 842, *aff'd,* 283 A.D. 942, 131 N.Y.S.2d 300. Likewise, in *Lucci v. Engel,* 73 N.Y.S.2d 78, 79 (Sup.Ct.1947), the court distinguished the torts of injurious falsehood and defamation and held that if the false statements complained of are defamatory, the statute of limitation applicable to defamation applies. The court reasoned:

> To hold that the complaint makes out a cause of action for injurious falsehood, which is in the nature of an action on the case, would permit plaintiff to escape the statute of limitations applicable to libel actions by the simple expedient of terming his action one on the case instead of one for libel.

73 N.Y.S.2d at 79. *See also Universal Airline, Inc. v. Eastern Airlines, Inc.,* 188 F.2d 993, 996 (D.C.Cir.1951); *Ouigley v. Hawthorne Lumber Co.,* 264 F.Supp. 214, 218–20 (S.D.N.Y.1967). We adopted a sim-

ilar approach in *Moore & Associates v. Metropolitan Life Insurance Co.,* 604 S.W.2d 487, 491 (Tex.Civ.App.—Dallas 1980, no writ), where we held that letters accusing a physician of charging excessive fees were defamatory and, therefore, article 5524(1) barred his claim for tortious interference with contracts as well as for libel.

In the present case, however, we need not go so far as to hold that the one-year statute applies whenever a false statement disparaging a business interest is also personally defamatory, although this result would seem to follow from the language of article 5524(1), which prescribes the one-year limitation period for action "for injuries done to the character or reputation of another by libel or slander." We hold, rather, that in determining whether the one-year statute applies to a defamatory or disparaging statement, a plaintiff's pleadings and proof must be examined to see whether the primary gravamen of the tort is an injury to the plaintiff's personal reputation, and whatever damages ensue from that injury, or whether the gravamen is a direct injury to the plaintiff's business or property. In making this determination, it is important to consider whether the plaintiff alleges that he has been falsely charged personally with criminal and dishonest conduct. Likewise, it is important to consider whether the damages sought are general damages for injury to personal reputation, humiliation, and mental anguish, all of which are typical of an action for defamation, as distinguished from specific damages to a particular business or property interest. If the main complaint is a false charge of personal misconduct and the damages alleged and proved are primarily personal and general, then the claim must be regarded as one for libel or slander within article 5524(1), even though incidental or consequential business or property losses are also pleaded and proved. On the other hand, if the main complaint is a false statement directly injurious to a business or property interest, and the damages alleged and proved are limited to business or property losses es-

tablished with the specificity required for these sorts of damages, then the claim may properly be considered as one for business or property disparagement, even though aspects of personal defamation may be incidentally involved. Under this rule, the injured party may sue for both torts in the same suit so long as he avoids duplication of damages, as the Restatement recognizes. Similarly, if the defamation claim is barred because of its shorter limitation period, the disparagement claim will not be barred by the shorter limitation period so long as the injured party does not plead allegations and proof typical of an action for defamation.

This analysis is consistent with *Brown v. American Freehold Loan Mortgage Company,* 97 Tex. 599, 80 S.W. 985, 988 (1904), on which plaintiffs rely. In *Brown* a petition alleging malicious destruction of the business of a firm of loan brokers by a competitor's false statements to the brokers' customers concerning the brokers' solvency and financial responsibility was held not subject to demurrer under the one-year statute of limitation. In that case the petition did not allege any statements charging the brokers with crime, although the statements complained of were alleged to disparage their honesty and reliability in business. The only damages alleged were lost profits of the business, not general damages to the brokers' reputations. We do not regard *Brown* as holding that business losses resulting generally from libel or slander are not within the one-year statute of limitations. Rather, it was a case in which the main complaint was direct injury to a business and only damages to that business were claimed.

We conclude that the injury alleged and proved here is a general injury to each plaintiff's personal reputation resulting from charges of fraudulent and criminal conduct rather than special injury to their business. No evidence was offered of damages resulting from loss of business expected from any particular customer or prospective customer to whom disparaging statements were made by defendants. The

damages alleged and proved resulted only indirectly from the disparaging statements alleged, and more immediately from the receivership, the orders revoking their licenses, and their prosecution for misappropriation of insurance premiums. Plaintiffs claimed, proved, and recovered all damages that would be recoverable in an action for personal defamation. Specifically, those damages included damages to personal reputation, alienation of friends, humiliation, and mental distress, none of which are damages allowed by law for business disparagement. Such pecuniary loss as was proved was loss of earnings in general by the individual plaintiffs rather than loss of profits from the particular business they were carrying on together. No attempt was made to calculate the expected profits from Agency Associates, based on volume of premiums, rate of commissions, and allowance for expenses. When a business has been completely destroyed by the tortious act of another, the measure of damages is the market value of the business on the date of the loss rather than the loss of expected profits. *Sawyer v. Fitts*, 630 S.W.2d 872, 874 (Tex.App.—Fort Worth 1982, no writ). Plaintiffs testified that their business was completely destroyed, but they offered no testimony concerning the value of that business.

In short, this suit has been pleaded as a slander case, proved as a slander case, and submitted to the jury as a slander case, with only formal use of the term "business disparagment" instead of slander. We cannot accept the view that defendants have waived this point by failing to object to the damage issues. Defendants pleaded the one-year statute in bar of the disparagement claim, moved for judgment on that ground, and urge that bar on this appeal. We hold that any recovery allowed for the "business disparagement" alleged here is barred by the one-year statute as a matter of law.

### (2) Liability for Statements to Public Officials

In addition to the one-year statute, defendants have presented other grounds establishing that recovery for "disparagement" is precluded as a matter of law. Plaintiffs alleged that the disparaging statements in question were made to the Attorney General, the Board of Insurance Commissioners, and to the grand jury in Harris County "with the knowledge that the Attorney General of Texas, the State Board of Insurance, and the Grand Jury, would act upon these representations in a manner adverse to the Plaintiffs." Defendants contended in the trial court, and also here, that "such problems and related damages as Plaintiffs may have suffered came at the hands of the proper state officials, and not these Defendants." They also contend that the disparaging statements made to Flanary are privileged and cannot form the basis of a suit for damages.

We agree. Plaintiffs have cited no authority, and we have found none, holding that a party may be held liable in damages for giving false information resulting in adverse action by a judicial or quasi-judicial agency. The law is well established that ordinarily no action for damages lies for a statement made in the course of a judicial proceeding, though the language be false and published with express malice. This rule applies to communications to law-enforcement officers and to agencies exercising quasi-judicial powers. *Reagan v. Guardian Life Insurance Co.*, 140 Tex. 105, 166 S.W.2d 909, 912 (1942) (letter filed with Board of Insurance Commissioners); *Hott v. Yarbrough*, 112 Tex. 179, 245 S.W. 676, 678–79 (1922) (letters to grand jury foreman and to county attorney). The rule is one of public policy founded on the theory that the good it accomplishes in protecting the public outweighs any wrong or injury that may result to a particular individual. *Reagan*, 166 S.W.2d at 913. The only remedy for such a wrong is an action for malicious prosecution or malicious abuse of civil process, neither of which is asserted here. *Runge v. Franklin*, 72 Tex. 585, 10 S.W. 721, 724 (1889). The same privilege applies

in a suit for "disparagement." *Ward v. Gee,* 61 S.W.2d 555, 557 (Tex.Civ.App.— Eastland 1933, writ dism'd); RESTATEMENT (SECOND) OF TORTS § 635 (1977); *Prosser and Keeton* § 128, at 973.

Plaintiffs contend that any claim of privilege is waived because defendants requested no issues or instructions to the jury on this defense. This contention raises the question of whether an absolute privilege is an affirmative defense on which defendants had the burden of proof. We conclude that it is not an affirmative defense where, as here, both pleadings and evidence show that the statements complained of were not actionable. We recognize that a defendant has the burden to plead and prove a qualified privilege in order to cast on the plaintiff the burden to establish malice. *Denton Publishing Co. v. Boyd,* 460 S.W.2d 881, 884 (Tex.1970). However, when the evidence establishes that the defamatory or disparaging statement was made to a public officer or was made in the course of a judicial or quasi-judicial proceeding, a different analysis applies. According to the authorities above cited, particularly *Reagan* and *Hott,* no action lies in this situation. As the supreme court stated in *Reagan:*

> The rule of privilege as applied to absolutely privileged communications is not founded on the theory that the communications furnish any defense, but on the fact that the law allows absolute privilege or immunity on account of the occasion upon which the communications is made.

166 S.W.2d at 913. *See also Putter v. Anderson,* 601 S.W.2d 73, 76 (Tex.Civ.App. —Dallas 1980, writ ref'd n.r.e.) (Defendant's trial amendment properly allowed to allege absolute privilege, since issue already before the court by plaintiff's own pleading and proofs.); *Duncantell v. Universal Life Insurance Co.,* 446 S.W.2d 934, 936 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.) (defamatory letter to Insurance Commission "not actionable"). We are not aware of any authority holding

that an absolute privilege is waived by failing to assert it as a defense.

In view of these authorities, we hold that plaintiffs' petition on its face and their own evidence show that defendants are not liable for any false statements made by defendants to the assistant attorney general or to the Board of Insurance Commissioners.

## TORTIOUS INTERFERENCE WITH CONTRACT RIGHTS

Some of the same grounds that bar plaintiffs' recovery for "business disparagement" also apply to their claim for tortious interference with contract rights because both claims are based on the same allegedly false and disparaging statements. Since these statements were personally defamatory, in that they had the effect of charging both criminal conduct and fraudulent business practices, and the damages sought resulted from injury to plaintiffs' reputation, the one-year limitation period provided by article 5524(1) bars recovery although the claim is designated as one for tortious interference. *Moore & Associates v. Metropolitan Life Insurance Co.,* 604 S.W.2d 487, 491 (Tex.Civ.App.—Dallas 1980, no writ).

Also, since the statements in question were made to the Attorney General and the Board of Insurance Commissioners, according to the allegations of the petition, the same immunity to liability for damages exists as in suits for defamation. *Prosser and Keeton* § 129, at 989.

In addition to these matters, other insurmountable obstacles lie in the way of plaintiffs' recovery for tortious interference with contracts. Plaintiffs have not alleged or proved any contract rights with which defendants interfered, other than Gulf Atlantic's own breach of contract with them, and plaintiffs have asserted no claims for breach of contract.

In their petition plaintiffs alleged: "Tortious interference with the contractual rights of the Plaintiffs in that the Defendants engaged in a course of conduct for the

express purpose of wrongfully interfering with their insurance business and the sale of insurance to cities, school districts and other similar firms. . . ."

 Plaintiffs offered in evidence none of the contracts on which they base any "contractual rights" with which defendants allegedly interfered. In order to establish a right of action for tortious interference with existing contract rights, there must be in existence a valid contract subject to that interference. *O'Connor v. Glitsch Engineering & Sales Corp.*, 589 S.W.2d 808, 809 (Tex.Civ.App.—Dallas 1979, no writ); *Armendariz v. Mora*, 553 S.W.2d 400, 404 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.). Plaintiffs did not establish any contract rights as between themselves and the "cities, school districts and other similar firms" to which they were selling group health insurance. In this activity plaintiffs were purporting to act as agents for Gulf Atlantic. Any economic benefits plaintiffs may have legitimately expected were to come from Gulf Atlantic in the form of commissions rather than from the policyholders and their members. If Gulf Atlantic breached its contract with plaintiffs, it may be liable to them for that breach, but plaintiffs have made no claim for breach of contract. Defendants' breach of their own contract with plaintiffs is not a basis for the tort of interference with contract rights. *See Rodriguez v. Dipp*, 546 S.W.2d 655, 657 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.) (breach of contractual duty does not constitute a tort); *Terry v. Zachry*, 272 S.W.2d 157, 159 (Tex.Civ.App.—San Antonio 1954, writ ref'd n.r.e.) (tort liability may arise for "breach of a contract between others"); *see also Prosser and Keeton* § 129, at 990. In this case no recovery can be based on interference with plaintiffs' existing contract rights because no existing contract rights were proved.

 The same difficulty exists if plaintiffs' claim may be considered one for interference with prospective economic advantage rather than with existing contract rights. The economic benefits expected were commissions from Gulf Atlantic for acting as its agents in selling group health insurance to "cities, school districts, and other similar firms," rather than from any prospective contractual relationships between plaintiffs and the prospective policyholders. Plaintiffs' only arguably established relationship was evidenced by Hovator's letter from the Southern Regional School District Association. Plaintiffs rely on this letter only as providing "access" to school officials. Any loss of value of this relationship resulted from the general injury to plaintiffs' reputation because of the receivership, license revocations, and criminal prosecutions rather than from any interference by defendants with plaintiffs' relationship with particular school officials. Consequently, plaintiffs have not established any right to recover damages for tortious interference with any relationship between plaintiffs and third parties from whom plaintiffs expected substantial economic advantages.

 Finally, no proper damages for tortious interference have been proved. The measure of damages for interference with contracts is the same as for breach of contract—the court attempts to put the plaintiff in the same economic position he would have been in had the contract not been breached. *Armendariz v. Mora*, 553 S.W.2d 400, 406 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.). Plaintiffs made no attempt to prove their expected profits based on their experience of selling group health insurance to "cities, school districts, and other similar firms." Neither the amount of premiums, the rate of commission, nor their expenses of doing business was proved. Nor did plaintiffs make even a general estimate of their prospective profits based on their actual experience. Actual damage or loss is an essential element of a claim for tortious interference. *Armendariz*, 553 S.W.2d at 404. Consequently, plaintiffs have failed to establish a right to recover damages for tortious interference with contract rights or with prospective economic advantage.

## CONSPIRACY

Plaintiffs' petition not only alleges claims against defendants individually for fraud, "business disparagement," and tortious interference with contract rights, but also alleges that defendants entered into a conspiracy to engage in such tortious conduct. In response to special issues the jury found that all defendants entered into a conspiracy to commit each of these alleged torts and that this conspiracy was a proximate cause of damages or loss to plaintiffs. In their motion for judgment and in this appeal, defendants contend that these findings are without support in the evidence and should be disregarded. We do not reach these contentions because of our holding that plaintiffs' claims against the individual defendants are barred by limitation and by the other considerations stated in this opinion. The gist of a civil conspiracy is the damage resulting from commission of a wrong that injures another and not the conspiracy itself. *Schlumberger Well Surveying Corp. v. Nortex Oil and Gas Corp.*, 435 S.W.2d 854, 856 (Tex. 1968). Thus an actionable civil conspiracy must consist of wrongs that would have been actionable against the conspirators individually. *International Bankers Life Insurance Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex.1963). Generally, if an act by one person cannot give rise to a cause of action, then the same act cannot give rise to a cause of action if done pursuant to an agreement between several persons. *Merrell v. Fanning & Harper*, 597 S.W.2d 945, 953 (Tex.Civ.App.—Tyler 1980, no writ).

We recognize an apparent exception to this rule in cases that involve a combination between defendants to refuse to deal with the plaintiff. In such cases acts committed by several persons in concert may constitute an actionable wrong, although the same acts by an individual would not be wrongful. *Delz v. Winfree*, 80 Tex. 400, 16 S.W. 111, 112 (1891); *Texas Public Utilities Corp. v. Edwards*, 99 S.W.2d 420, 424–25 (Tex.Civ.App.—Austin 1936, writ dism'd). This exception to the general rule, however, cannot be applied so as to extend the period prescribed by the statute of limitations in a case where all claims against the several tort-feasors are barred. We also recognize that liability may be based on a conspiracy to instigate a malicious prosecution, but we know of no authority holding that such liability exists where, as here, some of the elements of malicious prosecution cannot be proved and liability is asserted on other grounds, all of which are barred by limitations. Consequently, we hold that the jury's findings of conspiracy provide no independent support for the trial court's judgment for damages.

## THE STATEMENTS TO WAYNE HOLDER

In the foregoing discussion we have not considered the evidence of the statements made by defendants Barnes and Thompson to Wayne Holder, the city attorney of Freeport, that Gulf Atlantic was not underwriting the Nation-Wide group insurance program as bearing on the disparagement and tortious interference claims because, as we interpret plaintiffs' trial petition, it does not allege these statements as the basis for those claims, but rather attributes all of the damages alleged to Barnes' later statements to Flanary and to the Insurance Board, which resulted in the receivership, license revocations, and criminal proceedings. If the petition is subject to the interpretation that these statements to Holder are alleged as a basis for the disparagement and interference claims, there are other reasons why these statements provide no ground to support the trial court's judgment.

*First,* although we recognize that these statements are not protected by the absolute privilege applicable to statements made to a judicial or quasi-judicial agency, any cause of action based on these statements to Holder is barred by the two year statute of limitations because they were known to plaintiffs more than two years before the suit was filed. Hurlbut admitted in his testimony that Holder advised him in December 1974 that he had talked to Barnes and that Barnes had told

him that Gulf Atlantic was not underwriting the program. Consequently, the evidence shows as a matter of law that any cause of action plaintiffs had based on these statements arose more than two years before the suit was filed.

 *Second,* no damages were proved as the result of any disparaging statements by defendants to Holder, as distinguished from damages resulting from the subsequent proceedings for receivership, license revocation, and criminal prosecution. Plaintiffs lost no commissions expected from their arrangements with the city of Freeport because the evidence shows that plaintiffs obtained group health insurance coverage from another carrier, and there is no evidence that this coverage was on terms less advantageous than the terms plaintiffs expected to obtain from Gulf Atlantic. However, even if plaintiffs subsequently lost commissions expected from these arrangements, that loss was the result of the subsequent legal proceedings rather than directly from defendants' statements to Holder.

## JUDGMENT

The judgment of the trial court is reversed, and judgment is rendered that plaintiffs take nothing by this suit against any of the defendants.

Reversed and rendered.

AKIN, J., files a dissenting opinion.

AKIN, Justice, dissenting.

I cannot agree that the actions pleaded and proved should be considered claims for liable and slander, as characterized by both the majority and by the appellants and barred, therefore, by the one year statute of limitations. Neither can I agree that plaintiffs' actions were barred as a matter of law because the defendants failed to submit a jury issue on limitations with respect to disparagement, conspiracy to disparage the plaintiffs' business, or with respect to tortious interference with plaintiffs' contracts, as well as a conspiracy to interfere with plaintiffs' contracts. In-deed, the only limitations issue submitted to the jury was relevant to the fraud issue and that issue was answered in favor of the plaintiffs and against the defendants. Neither can I agree that the plaintiffs' suit was predicated upon a privileged communication or that a privileged communication need not be called to the trial judge's attention in any way and then be relied upon by the defendants as a ground for reversal and rendition, as the majority has chosen to hold. In my view, the privilege here is an affirmative defense which has been waived by the defendants. Apart from waiver, I find it untenable to reverse a trial judge on a ground not called to his attention.

Because my view of the facts differs in some respects from that of the majority, I find it necessary to recite the facts which, I believe, are established by a fair reading of the record. The relationship between the parties commenced before any of the alleged wrongful conduct occurred. Hurlbut was the regional manager for Gulf Atlantic in Houston from 1967 to 1974, when the venture from which this litigation emanates commenced. Hovater was an independent insurance agent with extensive experience in marketing group insurance policies and with extensive connections with school districts and municipalities in thirteen states. Hovater had been employed by a subsidiary affiliate of Gulf Atlantic for a short time in 1973. While in this capacity, Hovater became acquainted with Pat Anglin, a regional vice-president of Gulf Atlantic with responsibility for overseeing Gulf Atlantic's general agency operation. In early 1974, Anglin brought Hovater and Hurlbut together because he thought that they would make a "good team" for Gulf Atlantic's change in marketing concepts, referring specifically to Hovater's concept of marketing group policies to employees of school districts and municipalities.

Accordingly, Anglin arranged a meeting between Hurlbut, Hovater, the top executives of Gulf Atlantic, and defendant John Warner, the vice-president of marketing for Nationwide Corporation, Gulf Atlantic's

parent company. Among the executives of Gulf Atlantic at this seminal meeting were defendant William Barnes, president, defendant Earl Smith, secretary, defendant Kenneth Thompson, agency vice-president, Ralph Curtis, vice-president for marketing, and Harrol W. Watson, director of mass marketing. At this meeting, the defendants proposed that Hurlbut and Hovater form an entity to be known as "Agency Associates" to serve as the administrator for the proposed "Nation-Wide Health Insurance Trust," which would sell and service group health insurance policies, and that Gulf Atlantic would underwrite the program. According to plaintiffs, they were assured by the defendants that defendants' experience with similar operations elsewhere indicated that Hovater and Hurlbut could each expect to earn an annual personal income in excess of one hundred thousand dollars. Acting on these assurances, Hurlbut and Hovater returned to Houston to form Agency Associates and to consummate the trust arrangement as requested by the defendants.

Although the evidence concerning the April 1974 meeting at the Gulf Atlantic office in Dallas was disputed in some respects, the following facts are undisputed. At the meeting it was suggested that a trust[1] would be an appropriate vehicle for Agency Associates to handle the marketing and the funding of the program. Shortly after the meeting, Warner, Nationwide's marketing vice president, sent a proposed trust agreement to plaintiffs, and Gulf Atlantic issued numerous cash advances to plaintiffs for the purpose of forming Agency Associates. Additionally, Gulf Atlantic referred plaintiffs to a Dallas attorney, Ira Lee Allen, for the purpose of drafting the trust agreement and completing all necessary arrangements to implement the business agreement of April 1974, including the qualification of the trust in other states. Allen had previously represented Gulf Atlantic on other matters. Gulf Atlantic also referred plaintiffs to its printer to print all Nation-Wide Health Insurance Trust and Agency Associates literature, including rates and schedules. Before any materials were printed, Gulf Atlantic's vice-president, Thompson, received drafts of the proposed items to be printed, all of which concerned the Agency Associates promotion, as well as the Nation-Wide Health Insurance Trust and related documents. After the trust agreement had been prepared by attorney Allen, plaintiffs took it to the Franklin Bank in Houston, Texas, where the trust was signed by a bank officer for the bank to serve as trustee to hold premiums and monies deposited into a trust account. Thereafter, plaintiffs returned the executed trust to Allen, who, they believed, either had taken or would take all necessary steps to see that the trust had been filed with the proper authorities and, in conjunction with Gulf Atlantic, to see that the proper master policy was approved. To confirm this belief, Gulf Atlantic's Thompson instructed plaintiffs to commence sales under the trust since, according to Thompson, the master policy had been approved by the State Board of Insurance.

In reliance upon Thompson's instructions, plaintiffs commenced selling and issuing certificates of coverage under the Nation-Wide Health Insurance Trust to individual employees of numerous municipalities and school districts. Throughout, plaintiffs made monthly reports and accountings of all funds received and disbursed, which records were delivered directly to Gulf Atlantic's Thompson by Roy Bengel, Agency Associates' bookkeeper.

From this point, some aspects of the evidence are disputed, but evidence exists supporting the following version of the facts. Sometime after sales commenced, plaintiffs began receiving requests from insured groups for a copy of the master policy. Upon receipt of each of these requests, plaintiffs contacted Gulf Atlantic's

---

**1.** The normal procedure in the insurance industry is for the trust to have an administrator with powers to administer the affairs of the trust. This administrator then obtains a licensed insurance company to underwrite a master policy to the trust, which must be approved by the insurance commission. The trust then issues individual certificates to the employees covered.

Thompson and upon each occasion Thompson gave plaintiffs a different explanation as to why Gulf Atlantic could not furnish the master policy. Initially, Thompson told the plaintiffs that the trust and the master policy had been sent to Nationwide in Ohio for approval. Later, according to plaintiffs, Thompson told them that the trust and master policy had been sent to Warner for his personal approval. Later, Thompson explained that they were on the desk of Gulf Atlantic's president Barnes. During this time, both Barnes and Thompson continued to assure plaintiffs that all was in order with the program and that the master policy would shortly be forthcoming.

While this was transpiring, plaintiffs had called upon Arthur Tipton, deputy superintendent of the Humble Independent School District, with respect to the Nation-Wide Health Insurance Trust program, which was supposed to be a group health policy underwritten by Gulf Atlantic. Tipton contacted Thompson at Gulf Atlantic's home office in Dallas to verify that Gulf Atlantic was underwriting the program. According to Tipton, Thompson verified the existence of the trust and of the master policy, the nature of plaintiffs' business, and that Gulf Atlantic was underwriting the program.

Nevertheless, plaintiffs continued to be plagued by problems relating to the program since they could not secure the master policy. In one instance, because they could not produce a copy of the master policy, upon demand of the City of Freeport, Texas, plaintiffs put up $10,000 in an effort to protect the city from loss until the master policy was received. Plaintiffs referred Wayne Holder, the city attorney, to Thompson at Gulf Atlantic for confirmation. When Holder called Thompson he was unavailable, but Holder was able to reach Gulf Atlantic's president, Barnes, in December of 1974. Barnes denied emphatically that Gulf Atlantic was underwriting the program.

Earlier, in August of 1974, at or near the time that plaintiffs were instructed to begin selling, Gulf Atlantic had filed a similar master policy called the West Texas Pipefitters Trust. Plaintiffs had been given a copy of this trust, with the explanation that theirs would be the same. As originally submitted, the West Texas Pipefitters Trust policy was a general purpose filing and would have covered the groups solicited by the plaintiffs. The general purpose filing was withdrawn on November 20, 1974, and a single filing substituted after the insurance board refused to approve the policy as originally submitted. This policy was not finally approved until February 7, 1975. An investigation was subsequently made concerning this policy and Gulf Atlantic was fined $3,000.00 for failing to obtain approval of the policy before beginning sales under it.

Barnes' denial of knowledge of the Nation-Wide Health Insurance Trust, Agency Associates, or Hurlbut and Hovater, may be explained by Gulf Atlantic's difficult position with the insurance board in Austin. This denial by Gulf Atlantic prompted the city attorney of Freeport to call the Attorney General of Texas, John Hill, who immediately assigned Assistant Attorney General Bill Flanary to investigate Agency Associates, Nation-Wide Health Insurance Trust, and plaintiffs.

Flanary testified that he came to Dallas on January 11, 1975, to meet with Barnes of Gulf Atlantic. Barnes denied to Flanary knowledge of Agency Associates and of the Nation-Wide Health Insurance Trust, and denied that Gulf Atlantic was involved with either or with any other group health program. At this meeting, Flanary asked Barnes to maintain complete secrecy of the meeting, and Barnes agreed. After this meeting, Flanary conducted a detailed investigation of the activities of Hovater and Hurlbut.

As a result of this investigation, Flanary became convinced that Hurlbut and Hovater were selling group health insurance illegally and thus were civilly and criminally accountable. Flanary conveyed this information to Gulf Atlantic. The evidence supports an inference that by this time Gulf Atlantic and Warner of Nationwide had set about to insulate themselves and

their corporations from the potential liability. At about this time, in response to calls from Hovater and Hurlbut requesting the master policy and confirmations on behalf of the various insureds, Gulf Atlantic admitted that they had told plaintiffs that the policies would be forthcoming and to take no action. Nevertheless, plaintiffs telephoned Warner of Nationwide in Ohio with respect to the status of the master policy. Warner assured them that nothing was amiss and not to worry.

Thereafter, Warner of Nationwide Corporation arranged a meeting to be held in Gulf Atlantic's office in Dallas on January 21, 1975, to "straighten out" the Nation-Wide Health Insurance Trust matter. The date of this meeting is pertinent to defendants' plea of limitations. Plaintiffs were told that if they would attend, all problems would be put to an end. Contrary to these assurances, when Hovater and Hurlbut arrived at the meeting, they were directed to a conference room in which Flanary of the Attorney General's office was waiting. After introductions, Flanary instructed Hovater and Hurlbut to accompany him to the Attorney General's Dallas office.

At the Attorney General's office, Hovater and Hurlbut willingly gave statements concerning their involvement with the entire program and gave the Attorney General names of persons who could substantiate their statements. They also furnished the Attorney General with a copy of the West Texas Pipefitters Trust. Flanary told them that, pending a verification of these facts, the State of Texas would seek a receivership over their personal estates as well as over Agency Associates and the Nation-Wide Health Insurance Trust.

With this information in hand, Flanary returned to Gulf Atlantic's office to recheck the information previously given to him by Barnes. Barnes again confirmed that Gulf Atlantic did not write group health insurance, but when Flanary confronted him with a copy of the West Texas Pipefitters Trust and suggested that perhaps the wrong persons were under investigation Barnes refused to discuss the matter further.

Thereafter, Attorney General John Hill left office, as well as his assistant Flanary, who had no further connection with the investigation. But Flanary testified that before he left the Attorney General's office, he cooperated with the Harris County District Attorney's office in presenting criminal charges against Hurlbut and Hovater before a grand jury, which indicted plaintiffs before Flanary discovered the actual complicity of Barnes, Gulf Atlantic, and others connected with the defendants here. This indictment resulted in extensive media coverage both in newspapers and on television, much to the humiliation of plaintiffs, as well as their families. As a further result, plaintiffs' contracts with the insured groups were declared illegal, the Nation-Wide Health Insurance Trust was liquidated, and both plaintiffs lost their insurance licenses and were reduced to public humiliation and poverty.

## BUSINESS DISPARAGEMENT

I cannot countenance the majority's arbitrary characterization of the plaintiffs' disparagement claim as one for slander. Plaintiffs clearly pleaded a cause of action for disparagement, introduced evidence relevant to a disparagement claim, submitted to the jury special issues appropriate to a disparagement claim, and obtained favorable answers to those special issues. The majority blithely disregards all of this in concluding that plaintiffs' cause of action was not really for business disparagement after all, but rather was a cause of action for slander. I disagree with both the majority's perceived need to re-classify plaintiffs' disparagement claim and the conclusion they reach in so doing.

It is undisputed that an action for business disparagement is in many respects similar to an action for defamation. *Restatement (Second) of Torts*, § 623A, comment g; *Prosser and Keeton, The Law of Torts*, 5th Ed. § 128 at 964 (1977). In some fact situations the two torts may overlap. *Restatement (Second) of Torts*, § 623A,

comment g. The same statement may give rise to an action for disparagement and an action for defamation. *Kollenberg v. Ramirez*, 127 Mich.App. 345, 339 N.W.2d 176, 178 (1983); *Prosser and Keeton*, 965. In such situations, the plaintiff may bring suit for both torts so long as damages are not duplicated. *Kollenberg*, 339 N.W.2d at 179; *Restatement (Second) of Torts*, § 623A, comment g.

The actionable statements made by defendants furnished to Hurlbut and Hovater a basis for claims of both business disparagement and defamation. They could have sued for both torts so long as damages were not duplicated. Plaintiffs chose, however, to sue for only one of these torts—disparagement. They stipulated at trial that any claim for slander was barred by limitation. These facts apparently provoked the majority to state, without citing supporting authority, that "[w]hen the suit does not purport to be brought for both [torts], and one is barred by limitation, the court must decide which tort is claimed." I disagree with the majority's statement. It is well settled that pleadings are sufficient if they give the opposing attorney fair notice of the claim involved. *Castleberry v. Goolsby Building Corp.*, 617 S.W.2d 665, 666 (Tex.1981); TEX.R.CIV.P. 45, 47. This court's sole inquiry, then, should be whether plaintiffs' pleadings gave defendants fair notice of a claim for business disparagement. I would conclude that plaintiffs' pleadings gave such fair notice. The petition expressly alleged a cause of action for disparagement of plaintiffs' trade and calling, set forth facts pertinent thereto, and alleged that as a result of such disparagement plaintiffs suffered special damages in the form of lost earnings.[2] Accordingly, I would hold that plaintiffs sufficiently set forth a cause of action for business disparagement.

I also disagree with the majority's conclusions concerning the issue of privilege. It is important to note that the tort of business disparagement occurred when Barnes and Thompson made statements to Holder, city attorney for the City of Freeport, to the effect that Gulf Atlantic was not underwriting the group health insurance sold by plaintiffs. These statements set in motion the chain of events leading to plaintiffs' receivership and loss of earnings. Defendants were liable for the reasonably foreseeable consequences of their tortious statements. *Arroyo-Colorado Navigation District v. State National Bank*, 90 S.W.2d 881, 883 (Tex.Civ.App.— El Paso 1936, writ dism'd). Defendants, who were knowledgeable and experienced in the insurance business, could certainly have foreseen that their statements to Holder would ultimately lead to an investigation by state authorities into the affairs of Hurlbut and Hovater. Because the tortious statements were those initially made *to Holder*, they were not protected by the absolute privilege available to one who gives false information to a judicial or quasi-judicial agency.[3] Furthermore, these statements did not advance, and were not intended to advance, any of defendants' legitimate business interests. These statements were made solely to cover up defendants' own wrongdoing. They were made deliberately and without reasonable cause and thus were malicious. *See Walker v. Ruggles*, 540 S.W.2d 470, 473 (Tex.

---

2. I agree with the majority that under a cause of action for business disparagement plaintiffs may recover, as *actual* damages, only special damages for pecuniary loss to business interests. Neither damages to reputation nor consequential mental distress are recoverable in a disparagement action. (As discussed *infra*, those damages are recoverable by Hurlbut and Hovater under their other causes of action). *Punitive* damages, however, may be recovered in an action for disparagement. *See Walker v. Ruggles*, 540 S.W.2d 470 (Tex.Civ.App.—Houston [14th Dist.] 1976, no writ).

3. I disapprove of the majority's conclusion that an absolute privilege need not be pleaded as an affirmative defense (nor even brought to the attention of the trial judge). This conclusion apparently derives from a statement made by the supreme court in *Denton Publishing Co. v. Boyd*, 460 S.W.2d 881, 884 (Tex.1971). The authorities cited therein as support for the court's statement, however, do *not* stand for such a proposition.

Civ.App.—Houston [14th Dist.] 1976, no writ); *Kidd v. Hoggett,* 331 S.W.2d 515 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.).

I turn now to defendants' contention that there was insufficient evidence to support the finding of disparagement. To assess this claim, I must consider whether there was sufficient evidence to establish each of the elements of a disparagement action. The Texas business disparagement cases have not set forth explicitly the elements of business disparagement; however, *Walker v. Ruggles* has set forth the elements of a slander of title action, an action which, as *Walker* expressly states, also falls under the rubric of interference with prospective economic advantage. 540 S.W.2d at 473. Because business disparagement and slander of title fall under the same general rubric, the elements of business disparagement should be the same as those for slander of title, except insofar as slander of title relates particularly to an estate or interest in property and business disparagement relates particularly to a business, trade, or calling. Hence, following *Walker v. Ruggles,* I would hold that the following are the elements of business disparagement in Texas: (1) there must be the uttering and publishing of the words complained of; (2) the words must be false; (3) the publication must be malicious; (4) the publication must have caused the plaintiff special damages;[4] and (5) the words must relate to plaintiff's business, trade or calling.

A plaintiff has the burden to establish all of these elements. The plaintiffs in this case have sufficiently done so. Defendants' statements to Holder that they had not authorized plaintiffs to sell group health insurance and that, in fact, they did not know plaintiffs constituted the required utterance and publication. The evidence

supports the jury's finding that these statements were false. As noted above, defendants made these statements deliberately and without reasonable cause, and, therefore, under the standard of *Kidd v. Hoggett,* maliciously. I shall discuss below in detail the damages that plaintiffs have suffered. It will be clear from that discussion that plaintiffs have produced ample evidence of the special damages defendants' statements caused. Finally, defendants' statements denied the existence of business relations between Gulf Atlantic and the plaintiffs and hence were clearly related to plaintiffs' business. Accordingly, I conclude that plaintiffs' evidence was sufficient to establish business disparagement.

## CONSPIRACY

Gulf Atlantic and the other defendants argue that there was either no evidence or insufficient evidence to support a finding of a conspiracy against them. I do not agree. I conclude that there is evidence to support an inference that Hovater and Hurlbut were the victims of a conspiracy to conceal defendants' illegal issuance of insurance policies and to shift the blame to plaintiffs, which conspiracy resulted in the destruction of their insurance business, as set forth below.

Civil conspiracy is defined by the supreme court as "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Schlumberger Well Surveying Corporation v. Nortex Oil & Gas Corporation,* 435 S.W.2d 854 (Tex. 1968). Other Texas courts have set forth six elements necessary to establish a civil conspiracy. The evidence must establish (1) a combination of two or more persons, (2) an agreement or meeting of the minds among these persons, (3) on a common

---

**4.** *Walker v. Ruggles* held that a plaintiff in a slander of title action was not precluded from recovering damages merely because he failed to prove the loss of a *specific* pending sale due to the defendant's disparaging statements. The supreme court has since held that a plaintiff is required to prove the loss of a specific sale or sale in order to recover in a slander of title

action. *A. H. Belo Corp. v. Sanders,* 632 S.W.2d 145, 146 (Tex.1982). *Sanders* expressly overruled *Walker* "insofar as [ *Walker* ] is inconsistent with this holding." *Sanders,* 632 S.W.2d at 146. In our case plaintiffs proved that the disparaging statements of defendants caused plaintiffs to lose, at minimum, their initial group health insurance sale to the City of Freeport.

object, purpose, or course of action, (4) knowledge of the object and purpose, (5) one or more overt acts, and (6) intent to participate therein. *International Bankers Life Insurance Company v. Holloway*, 368 S.W.2d 567 (Tex.1963); *Hill v. Robinson*, 592 S.W.2d 376, 383 (Tex.Civ.App.— Tyler 1979, writ ref'd n.r.e.); *Mims v. Bohn*, 536 S.W.2d 568, 570 (Tex.Civ.App.— Dallas 1976, no writ); *Maxey v. Rodman*, 444 S.W.2d 353, 357 (Tex.Civ.App.—El Paso 1969, writ ref'd n.r.e.).

Gulf Atlantic contends that there is no evidence to support these elements of conspiracy. However, in conspiracy cases there is rarely any direct evidence revealing the conspiratorial activities. As the supreme court has noted:

> When men enter into conspiracies, they are not likely to call in a witness.... In such cases the injured party must necessarily have recourse to circumstantial evidence. For it is only by the inferences and deductions which men properly and naturally draw from the acts of others in such cases, that their intentions can be ascertained. They are not likely to proclaim them in the hearing of witnesses.

*International Bankers Life Insurance Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963) (quoting *Jernigan v. Warner*, 12 Tex. 189 (1854)). The evidence in this case establishes that officials of Gulf Atlantic Life Insurance Company and Nationwide Corporation, including William Barnes, Kenneth Thompson, William Smith and Jack G. Warner combined to conceal their illegal issuance of policies under the Nation-Wide Health Insurance Trust by shifting the blame for the illegal issuance to plaintiffs, and thus unlawfully instigated plaintiffs' prosecution and destroyed plaintiffs' insurance business. *See Thomas v. Cisneros*, 596 S.W.2d 313, 316–317 (Tex. Civ.App.—Austin 1980, writ ref'd n.r.e.) (unlawful to instigate criminal prosecution with knowledge that charges are false); *Texas Public Utilities Corporation v. Edwards*, 99 S.W.2d 420, 424–425 (Tex.Civ. App.—Austin 1936, writ dism'd) (unlawful to combine to destroy another's business without legal justification). These defend-

ants participated in setting up the Nation-Wide Health Insurance Trust and in preparing and filing the West Texas Pipefitters Trust. Throughout the time that the West Texas Pipefitters Trust master policy was pending approval, they continually assured plaintiffs and their customers that a master policy was forthcoming. After this general purpose master policy filing was withdrawn, the defendants, aware that no master policy existed for plaintiffs' trust, began to deny knowledge of, or participation in, the plaintiffs' business.

This plan to cover up Gulf Atlantic's and Nationwide's violation of the insurance laws began when the city attorney for Freeport, Holder, called Barnes at Gulf Atlantic in December of 1974, and Barnes denied any knowledge of plaintiffs' trust and that Gulf Atlantic was underwriting it. Thompson learned of this call, and later Warner received a phone call from Barnes concerning their problem. In early January of 1975 Holder called the Attorney General's office, which began an investigation of the plaintiffs. During this investigation, Barnes again denied knowledge of plaintiffs' trust and of Gulf Atlantic's participation and also denied that Gulf Atlantic wrote group insurance, specifically denying knowledge of the West Texas Pipefitters Trust master policy. After the meeting between Flanary and Barnes, William Smith, Gulf Atlantic's Secretary, called the plaintiffs, who had a copy of the West Texas Pipefitters Trust, and told them to "burn it." Plaintiffs did not know, however, that Gulf Atlantic had intended to use the same master policy for both trusts.

In furtherance of their efforts to shift the focus from their own wrongdoing, the defendants, acting chiefly through Warner, set up the January 21, 1975, meeting at which plaintiffs were confronted by Assistant Attorney General Flanary. Plaintiffs were enticed to this meeting by Barnes' and Warner's continued assurances that they could get the problems worked out. At this meeting, Barnes and the other representatives of the companies present denied plaintiffs' authority to write group

policies for Gulf Atlantic under the insurance trust. Plaintiffs were then taken to the Attorney General's office for questioning. Immediately after this meeting letters were prepared and mailed cancelling and terminating all agent contracts between Gulf Atlantic and the plaintiffs.

As a result of the investigation, Flanary filed a lawsuit on behalf of the State of Texas against the plaintiffs. Proceedings also began before the State Insurance Board to revoke plaintiffs' licenses and the case was referred to the Harris County grand jury which returned indictments against Hovater and Hurlbut. In these last two proceedings, some of the individual defendants appeared and gave testimony against the plaintiffs.

The evidence establishes, therefore, that the defendants combined to employ unlawful means, *viz.*, the instigation of an unwarranted prosecution against plaintiffs and the attendant destruction of plaintiffs' business, in order to accomplish the common purpose of concealing defendants' role in the illegal issuance of the Nation-Wide Health Insurance Trust policies. Each of the defendants, as representatives and agents of both Gulf Atlantic and Nationwide Corporation, knew the purpose of this conspiracy to conceal and each engaged in "overt acts" to further the conspiracy after the West Texas Pipefitters Trust master policy had been disapproved. It may be inferred that each defendant knew of the import of his actions and had intent to particpate therein. Thus, every element needed to prove a finding of civil conspiracy is supported by competent evidence.

### FRAUD

Next, Gulf Atlantic asserts that there is no evidence or insufficient evidence to support the jury's finding of fraud. Gulf Atlantic also contends that the jury's answers to special issues 1 and 4 should have been disregarded because the plaintiffs could not have justifiably relied upon the alleged representations of Gulf Atlantic because they had actual knowledge that no master policy had been approved and that

the trust was not complete. In this respect, Gulf Atlantic denies that the alleged misrepresentations were made to plaintiffs and argues that, in any event, plaintiffs failed to prove the necessary elements of reliance and intent. I do not agree. In my view, there is evidence, as set forth, *supra*, to support the jury finding of fraud and that plaintiffs have established all elements necessary to recovery.

To establish actionable fraud one must prove: (1) that a material misrepresentation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; and (6) that the party thereby suffered injury. *Wilson v. Jones*, 45 S.W.2d 572 (Tex.Comm'n App.1932, holding approved); *see Custom Leasing Inc. v. Texas Bank & Trust*, 516 S.W.2d 138 (Tex. 1974).

The first question is whether material misrepresentations were made. Special issue number 4, to which the jury answered "we do" as to each defendant, inquired about the alleged misrepresentations as follows:

> Do you find a preponderance of the evidence that any of the following Defendants fraudulently represented to Plaintiffs that Plaintiffs were authorized to write group health insurance through a trust arrangement to be underwritten by the Gulf Atlantic Insurance Company?

This special issue is somewhat unclear, but in light of the pleadings and evidence, I conclude that it is asking essentially whether defendants made two different false representations to plaintiffs: first, that all necessary approvals had been obtained from the underwriting company and the insurance board and, therefore, plaintiffs were legally authorized to sell group health insurance under the proposed master policy and trust arrangement; and, second, that defendants intended to underwrite the trust arrangement for the group health

insurance. It is undisputed that the first representation, that all necessary approvals had been obtained, was false. To prove actionable fraud with respect to the second representation, that defendants intended to underwrite the trust agreement, it is necessary to show that the defendants did not intend to perform at the time the promise was made. *Underwood v. Williams,* 488 S.W.2d 515 (Tex.Civ.App.—Fort Worth 1972, no writ); *Precision Motors v. Cornish,* 413 S.W.2d 752 (Tex.Civ.App.—Dallas 1967, writ ref'd n.r.e.). Both knowledge that the first representation was false and lack of intent to perform with respect to the second representation can be inferred from evidence that Gulf Atlantic denied making any such representations. *See also Stanfield v. O'Boyle,* 462 S.W.2d 270, 272 (Tex.1971); *Stone v. Williams,* 358 S.W.2d 151 (Tex.Civ.App.—Houston 1962, writ ref'd n.r.e.).

Gulf Atlantic next argues that plaintiffs failed to establish justifiable reliance because of their knowledge concerning the master policy and the trust. Assuming, without deciding, that reliance in a fraud case must be justifiable, I shall consider the evidence. Plaintiffs may have known at some point before January 21, 1975, that the master policy had not received authorization from the insurance board. Defendants assured plaintiffs, however, that defendants would obtain the necessary approval. These misrepresentations kept the plaintiffs misled and thereby prevented them from learning that defendants had abandoned any intention to secure approval for the master policy or to underwrite it at all. As to their knowledge of the trust, plaintiffs testified that they had executed the trust instrument, had the corporate trustee execute it, and then had forwarded it to attorney Allen for completion. Allen informed them that Gulf Atlantic was reviewing it, although Gulf Atlantic later denied knowledge of the trust. A fully executed copy of the trust was not introduced at trial; however, there was testimony that such an instrument was seen in the files of the attorney. Plaintiffs had no knowledge about the trust which would have made

reliance on defendant's misrepresentations unjustified.

With respect to defendants' argument of unjustified reliance, defendants also contend that the plaintiffs had no right to rely on representations which proposed an illegal contract between Gulf Atlantic and plaintiffs. I do not agree. In *Oakes v. Aetna Casualty,* 551 S.W.2d 504, 506 (Tex. Civ.App.—Amarillo 1977, writ ref'd n.r.e.), this same argument was rejected. There, as here, the agreement was not to issue policies of insurance which had not been approved, but rather to issue policies for which the insurance company would obtain approval. There is evidence here indicating that any illegality occurred only because Gulf Atlantic failed to perform its obligation under the agreement and TEX.INS. CODE ANN. art. 3.42 (Vernon 1981), *see Oakes,* 551 S.W.2d at 507, to obtain approval by the Texas Insurance Board of the master policy, which necessarily would have supported the executed trust in the hands of Gulf Atlantic.

## INTERFERENCE WITH CONTRACTUAL RELATIONS

I now turn to Gulf Atlantic's contention with respect to tortious interference with contractual relations, it must be established that: (1) there is a contract subject to interference; (2) the act of interference was willful and intentional; (3) such intentional act was the proximate cause of plaintiffs' injury; and (4) actual damage or loss occurred. *Armendariz v. Mora,* 553 S.W.2d 400, 404 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.). It is also necessary to establish that the defendant had actual knowledge of the existence of the contract and of the plaintiff's interest, or, at least, knowledge of such facts that would lead reasonable men to believe its existence. *Id.* at 406. An additional element required to recover for contract interference is that the interference must be without right or justification. *Black Lake Pipe Line Co. v. Union Construction Co.,* 538 S.W.2d 80 (Tex.1976).

Gulf Atlantic contends that there is no evidence or insufficient evidence to support plaintiffs' recovery under this cause of action. Gulf Atlantic argues that the existence of these contracts was not proven at trial since the only contracts introduced were the contracts between plaintiffs and defendants. I disagree. The record reflects that plaintiffs entered into contracts with third parties for the sale of insurance. Certificates of insurance issued to third parties were introduced at trial. A certificate of insurance, alone, however, has been held insufficient to show that a contract exists. *Wann v. Metropolitan Life Insurance Co.*, 41 S.W.2d 50 (Tex.Comm'n App. 1931, holding approved). In *Wann*, the court held that it was necessary to introduce the policy of insurance incorporated by reference into the certificate in order to recover. Our case is distinguishable in that, because of Gulf Atlantic's *fraud*, there was no master policy of insurance. Nevertheless, plaintiffs have established the existence of these contracts and their terms through testimony and other evidence; have shown that the contracts were subject to interference, *O'Conner v. Glitsch Engineering & Sales Corp.*, 589 S.W.2d 808 (Tex.Civ.App.—Dallas 1979, no writ); and have shown that defendants had actual knowledge that plaintiffs had been soliciting these contracts and had collected premiums for some of them. The detailed provisions of the contracts are not material here, as they would be in a suit, such as *Wann*, to recover on the contracts themselves.

Gulf Atlantic next contends that any acts or statements on its part were not shown to have caused the third parties to breach their contracts with plaintiffs. Interference with contractual relations includes not merely the procurement of a breach of contract, but all invasions of contractual relations, including any act injuring or destroying persons or property which retards, makes more difficult, or prevents performance. *Tippett v. Hart*, 497 S.W.2d 606 (Tex.Civ.App.—Amarillo, *writ ref'd n.r.e. per curiam*, 501 S.W.2d 874 (Tex.1973). The record reflects that Gulf Atlantic's

acts of interference were willful and intentional. After initially representing to plaintiffs and to others that Gulf Atlantic was underwriting the insurance program, Gulf Atlantic denied such participation and repudiated plaintiffs before the city attorney for Freeport and before a representative from the Attorney General's office. These statements and acts were made and done solely in an effort to hide defendants' own wrongdoing. By shifting the focus of attention to plaintiffs, defendants tortiously interfered with plaintiffs' contracts with third parties and prevented them from being able to offer even a substitute performance. This interference by Gulf Atlantic and Nationwide with plaintiffs' contractual relations caused plaintiffs to become the subjects of an investigation which led to their censure by the insurance board and to criminal prosecution by the State of Texas. Other insurance companies with which plaintiffs had contracts terminated their contracts with plaintiffs because of these defendants' tortious activities. Finally, plaintiffs lost their licenses to sell insurance and could not continue their life-long careers as insurance agents.

Gulf Atlantic argues, however, that even if its acts interfered with plaintiffs' contractual relations, there can be no recovery because all such contracts were illegal. Thus, Gulf Atlantic contends that there can be no legally protected rights in such a contract citing *Guaranty Bank v. National Surety Corp.*, 508 S.W.2d 928 (Tex.Civ. App.—Dallas 1974, writ ref'd n.r.e.). I cannot agree with this argument because any invalidity or illegality of plaintiffs' contracts with third parties was the result of defendants' fraudulent representations and of defendants' failure to obtain approval of a master policy. Consequently, I would hold that under these circumstances, illegality of the insurance contracts sold by plaintiffs is not a defense to plaintiffs' cause of action. *Guaranty Bank*, 508 S.W.2d at 933.

Gulf Atlantic also asserts, as a defense to plaintiffs' claims, that any actions taken by it were justified on the grounds that a

party has a privilege to interfere with the contract of others when such interference is a bona fide exercise of his own rights or when the party possesses an equal or greater interest to that of the plaintiff in the subject matter, citing *Terry v. Zachry,* 272 S.W.2d 157, 159 (Tex.Civ.App.—San Antonio 1954, writ ref'd n.r.e.); *Morris v. Jordan Financial Corp.,* 564 S.W.2d 180 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r. e.); *Black Lake Pipeline Co.,* 538 S.W.2d at 91. Although I agree with this principle, when plaintiffs establish a prima facie case the burden shifts to the defendants to establish that the interference was justified. *Armendariz,* 553 S.W.2d at 405; *Tippett,* 497 S.W.2d at 613. Gulf Atlantic has failed in this burden.

In concluding this section, I would hold that the record supports the jury findings that defendants tortiously interfered with plaintiffs' contractual relations. Furthermore, I would hold that defendants have not established any defense to defeat plaintiffs' recovery.

### ACTUAL DAMAGES

Gulf Atlantic contends next that the jury's findings of actual damages are erroneous. These findings, in Gulf Atlantic's view, have insufficient support, both legally and factually, in the evidence and are excessive. Gulf Atlantic also argues that a remittitur is in order. I disagree. Accordingly, I would overrule Gulf Atlantic's contentions with respect to the jury's award of actual damages and decline to hold the damages excessive.

The trial court submitted two issues inquiring as to the actual damages sustained by Hovater and by Hurlbut. These issues were identically phrased except that one referred to Hurlbut whereas the other referred to Hovater. The issue was as follows:

What sum of money, if any, if paid in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate [the plaintiff] for his actual damages, if any, you have found from a preponderance of the evidence

resulting from the events in question? In arriving at your answer, you may consider the following elements of damage and none other: Loss of earnings, loss of earning capacity, effect on reputation and mental anguish.

In response to the issue, the jury found that Hovater and Hurlbut should each receive $1,200,000.00.

Our authority to determine whether the damages awarded are excessive is derived from our authority to determine whether fact findings are supported by sufficient evidence. TEX.R.CIV.P. 440 grants us authority to order a remittitur as a condition of denying a new trial. Under rule 440, in determining whether damages are excessive thus requiring remittitur, the jury's finding should first be examined to determine if the evidence is sufficient from a factual standpoint because the supreme court has stated that the court of appeals' power to pass on questions of excessive damages stems from its jurisdiction over questions of fact. *Pan Lip Chew v. Gilliland,* 398 S.W.2d 98, 103 (Tex.1965); *Bond v. Otis Elevator,* 388 S.W.2d 681, 687 (Tex. 1965); *Port Terminal Railroad Assoc. v. Ross,* 155 Tex. 447, 289 S.W.2d 220 (1956); *Panama Refining Co. v. Crouch,* 132 Tex. 608, 124 S.W.2d 988, 990 (1939); *Texas & New Orleans Ry. Co. v. Neill,* 128 Tex. 580, 100 S.W.2d 348, 349 (1937); *Horton v. Benson,* 277 S.W. 1050, 1051 (Tex.Comm'n App.1925, opinion adopted). Consequently, if sufficient evidence exists from a factual standpoint to uphold the verdict, then the verdict should be sustained. On the other hand, if the evidence is lacking factually, then this court should exercise our discretion in determining the amount of damages supported by the evidence in order to determine whether to order a remittitur or to remand for another trial.

I note, however, that the supreme court decision in *Wilson v. Freeman,* 108 Tex. 121, 185 S.W. 993 (1916) stated:

All the court of civil appeals can do and all that is required of it to do ... is to exercise its sound judicial judgment and discretion in the ascertainment of what

amount would be reasonable compensation for the injury sustained, and treat the balance as excess. . . . [Having made this determination] it should authorize a remittitur of the excess above the amount which would be reasonable compensation from the injury, in accordance with its sound judgment.

See also *Flanigan v. Carswell*, 159 Tex. 598, 324 S.W.2d 835, 840 (1959). Although we must follow an approach promulgated by the supreme court, the *Wilson* test inverts the proper order of analysis. This decision has been modified, *sub silentio*, by subsequent supreme court decisions as cited, *supra*.

In my view, the evidentiary test set forth in more recent supreme court decisions has tacitly overruled the *Wilson* approach because the evidentiary test of more recent cases precludes an undue interference with the jury's broad discretion to assess damages within the range of the evidence. Under the *Wilson* test, a court of appeals decides what it thinks the proper amount of damages should be and then compares that amount with the findings of the jury. This approach gives the courts of appeals power beyond that necessary to implement a remittitur. The power to order a remittitur is granted so that when an appellate court determines that the amount of damages awarded in a case is the only error in a judgment, it may order the excessive amount of damages remitted. By a remittitur the expense of reversing the case, thus requiring a new trial, is obviated. Our concern from an evidentiary standpoint should be only whether the evidence supports the verdict rather than whether we would prefer to see a different amount of damages awarded. Of course, if the evidence is found lacking, a remittitur must be ordered to reduce damages awarded measured by the evidence adduced.

My research in the area of excessive verdicts and remittiturs discloses that the issue of excessive verdicts has been confused with questions of jury misconduct. An expression of this confusion is found in the following quotation from *Wharf Cat,*

*Inc. v. Cole*, 567 S.W.2d 228, 230 (Tex.Civ. App.—Corpus Christi 1978, no writ):

On appeal, the findings of the jury will not be disturbed on the ground of "excessiveness" if there is any probative evidence to sustain the award unless the record shows that the minds of the jurors were so controlled by passion, prejudice, or bias as made them unwilling to consider the case on its merits, to the end result that the award is so excessive that it shocks the conscience of the appellate court.

See also *Hernandez v. Braddock*, 641 S.W.2d 359, 363 (Tex.App.—Corpus Christi 1982, no writ); *Armellini Express Lines of Florida, Inc. v. Ansley*, 605 S.W.2d 297, 310 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.); *Bell Helicopter v. Bradshaw*, 594 S.W.2d 519, 537 (Tex.Civ.App.— Corpus Christi 1979, no writ); *Browning v. Paiz*, 586 S.W.2d 670, 676 (Tex.Civ.App.— Corpus Christi 1979, writ ref'd n.r.e.). I fail to perceive a relationship between questions of jury misconduct and questions of an excessive verdict. The Rules of Civil Procedure make no mention of a passion or prejudice requirement for remittitur. These two questions, in my view, merit entirely different considerations. The only issue which should be examined with respect to an excessive verdict is whether the evidence is sufficient to support the verdict. Obviously, many questions unrelated to the sufficiency of the evidence are involved with respect to jury misconduct. Consequently, I expressly disagree with these cases, all of which were decided by the Corpus Christi Court of Appeals.

With respect to this analysis, the supreme court has held in *World Oil Co. v. Hicks*, 129 Tex. 297, 103 S.W.2d 962 (1937), that an excessive verdict should not be utilized to infer that a jury was motivated by passion or prejudice. The view that a verdict may be held excessive without extrinsic evidence that the jury was motivated by passion or prejudice was reaffirmed in *Dallas Ry. & Terminal Co. v. Farnsworth*, 148 Tex. 584, 227 S.W.2d 1017, 1022 (1950). As noted by the court in *World Oil*, once an inference of passion or preju-

dice has been made from the fact that a verdict is excessive, the verdict is tainted, thus logically requiring reversal of the entire judgment. Remittitur would not be a viable consideration.

The confusion resulting from intermingling the question of jury misconduct and the evidentiary question of whether the verdict is excessive is apparently the result of the following dicta in *World Oil:*

> There are cases where a shockingly excessive verdict, and the record as a whole, leaves no room for doubt that the minds of jurors were so controlled and dominated by passion and prejudice as made them incapable of, or entirely unwilling, to consider a case on its merits. The remedy in such a case is to set the verdict aside and refuse remittitur.

This language was also quoted in *Dallas Railway.* A large verdict alone should not indicate impropriety. To hold to the contrary would prompt attack on all but the most niggardly verdicts on the basis that they are indicative that the jury acted improperly. On law review commentator has suggested that the proper interpretation of the dicta in *World Oil* is to read the phrase "shockingly excessive verdict," and "the record as a whole" together. Smith, Texas Remittitur Practice, 14 S.W.L.J. 150, 160 (1960):

> If the dictum in *World Oil* is interpreted to mean that the court of civil appeals may remand a case in which the error alleged on appeal is that of excess, but in which the record plainly indicates other prejudicial error as well as an excessive verdict, the dictum may be fitted into the scheme of remittitur practice. Implicit in their meaning is the assumption that the reviewing court determines that the other errors in the record establish the jury found improperly on liability as well as damages.

I agree with this interpretation of *World Oil* because the analysis of excessive verdicts and jury misconduct should be segregated.

Finally, in my examination of cases on excessive verdicts, I note that conflicts exist among cases as to whether verdicts in other cases should be examined and compared with the verdict under examination. Gulf Atlantic suggests that we utilize this comparative approach. I would decline to do so because I agree with those opinions holding that the comparative approach is unhelpful due to the impact of inflation on the vlaue of the dollar and refuse to be bound by earlier cases which were decided when the dollar held a greater value. The comparative approach must be rejected for yet another reason. Obviously, each case presents a unique fact situation and each case has a jury with a unique perspective. This is especially true, as in the instant case, where damages (such as injury to reputation) which are not easily quantified are involved. The difficulty of making a comparison between different facts, different juries, and highly subjective areas of damage is obvious. Consequently, I conclude that determination of whether the damages are excessive should rest solely upon the evidence in the record rather than upon the comparative approach advanced by Gulf Atlantic.

I turn next to the evidence of damages adduced at trial. Four witnesses testified as to Hovater's and as to Hurlbut's damages. These witnesses were Hovater and Hurlbut themselves and their respective wives. Hurlbut testified that as a result of an Attorney General's investigation their agency was placed in receivership and that both he and Hovater were criminally indicted. The files and assets of their agency were seized. Both men were incarcerated in the Harris County jail for approximately twelve hours after their arrest. News of their indictments was carried in both local newspapers and on local television news programs. This was the first time that Hurlbut had been arrested on any matter other than a traffic ticket. He also testified that the emotional stress and the thought of going to jail was "terrible." Prior to the revocation of his insurance license, Hurlbut stated that during the first four years after the indictment, he was forced to engage in contract labor. He did

such things as roofing and digging sewer lines. After the indictment, Hurlbut testified that before the indictment his income was between twenty and thirty thousand dollars per year. Hurlbut's W–2 forms for the four years after the indictment were introduced, which showed that his income for the four years in question ranged between 6,500 and 9,500 dollars. Part of this income came from renewal commissions which Hurlbut received from policies issued while he was an insurance agent. Four years after the indictment, Hurlbut was able to acquire a position as a personnel consultant, at approximately the same salary which he had earned as an insurance agent. Hurlbut also testified that his wife was forced to work for the first time in their twenty-six-year marriage and that, due to his indictment and subsequent loss of income, he was unable to provide a college education for his children. He began taking tranquilizers after the indictment, but was unable to sleep at night. As an indication of his loss of income, Hurlbut testified that individuals at Gulf Atlantic later started other trusts of the type which they had agreed upon and that these trusts were making a hundred thousand dollars or more per year, just as Gulf Atlantic had represented to him at the inception of this transaction.

Mrs. Hurlbut testified that she first learned that her husband had been placed in receivership when she heard it on the news. The television reports made it appear that her husband "had absconded with a huge sum of money" and "just made it sound real terrible." There were broadcasts on the six and ten o'clock news and the newspapers carried stories on the matter. One newspaper had placed her husband's picture on the front page. Her husband was dazed by the situation which beset him. Some friends called to offer support, but others, whom they had expected to call, did not. They had to borrow money from their family to provide sustenance. She stated that her husband was hurt very much because he could not provide for his family and was deeply hurt by the effect the publicity had on his children.

After her husband was indicted, there was a new wave of publicity even more intense than the first. Even fewer of their friends called to offer support than before. Before the incident, Mrs. Hurlbut characterized her husband as having many friends and being prominent in the community. In this respect, Hurlbut had been active in his church's youth organization but quit working in it after the publicity. Also, after he was incarcerated he walked the floor a lot more, "and then he settled down." His outlook was cynical and withdrawn and he does not trust people as he did previously. She stated that he had gone from Houston to Austin on several occasions in order to try to regain his insurance agent's license. On these occasions, he had either slept in the car or returned directly home due to lack of money. She testified that for the first time in his life, her husband had to do manual labor. He came home filthy and tired. He was forty-six at the time. She also stated that due to the indictment they were unable to send their children to college.

Hovater testified that he had lost his license to sell insurance and that he had also lost his recording agent's license. In addition, Hovater testified concerning his incarceration after being indicted. Hovater was arrested a second time and forced to spend the night in jail. His second detention occurred when he was driving home after he and his wife had spent the day on a job cleaning burned apartments. He was taken from his car and searched. After being allowed to go home to change his sooty clothes, he was incarcerated overnight. Like Hurlbut, this was Hovater's first serious brush with the law. He testified that when the assets of the agency were seized everything was taken, including a portable radio which had been a present from his father-in-law to his wife and a plaque which his children had given him on father's day. His personal bank accounts and the accounts of his children were seized. He attempted to borrow money and was lent a thousand dollars by a banker with whom he had dealt for many

years. However, when this banker learned that Hovater had been "blackballed" by other banks, the banker called Hovater and demanded repayment of the money. His family subsisted for several days on change found in dresser drawers and in suit pockets. He had to take his wife, who is a diabetic, to her sister's house to insure that she was properly fed. All mail directed to Hovater's business address was intercepted and opened by the Attorney General's office. Hovater's income, which was approximately thirty thousand dollars per year before the indictment, was reduced to ten or eleven thousand dollars per year. He was forced to engage in manual labor to support himself, but was only able to work half a day. Additionally, Hovater was at one time under the care of two doctors and took mild medication daily. He also stated that he had been generally embittered by the experience and had lost his "happy-go-lucky" perspective on life. Hovater also testified that representations were made by Gulf Atlantic that people operating trusts, such as the one planned, had earned from a hundred up to a hundred and fifty thousand dollars a year, within the range of the representations made to him by the defendants. Likewise, since this transaction, Gulf Atlantic, according to Hovater, had commenced similar group programs where the agents had made up to $150,000 each.

Hovater's wife also testified. She stated that Hovater had worked continuously as an insurance agent since 1957. The revocation of Hovater's license, the receivership of his agency, and the indictment, according to Mrs. Hovater, made him sick and his condition was just something she couldn't describe. Her husband had trouble sleeping and was nervous. After the receivership, their church made one of their house payments and they used change from around the house to buy groceries. Mrs. Hovater took courses so that she could go back to work, but she was unable to secure a job close enough to her home. Her husband had to seek work as a manual laborer. Besides the adverse publicity arising from the receivership, a second wave of publicity occurred when her husband and Hurlbut were indicted. According to Mrs. Hovater, they were heavily in debt at the time of trial, as well as at the time of the receivership. Due to their financial condition, she had been unable to have a needed operation. Her husband had never been an accused, to her knowledge, in a criminal matter other than a traffic ticket. She reiterated the circumstances of her husband's arrest. Although he still met people "okay," she indicated that her husband was not as lighthearted as he once was and that he had become cynical. She also stated that he was able to do but a half day's work in a full day.

I would hold that this evidence is sufficient, from both a legal and factual standpoint, to support the verdict. By concluding that the evidence is sufficient, I also dispose of Gulf Atlantic's contention that the verdict was excessive. The evidence demonstrates that the lives of Hurlbut and Hovater, as well as their respective families, were totally disrupted by the chain of events set in motion by Gulf Atlantic and the other defendants. Both men were subjected to the public indignation of having their agency seized and placed in receivership by the Attorney General's office and to further public scorn by being indicted and incarcerated for the first time in their lives. Furthermore, they were unable, at least temporarily, to support their families and were forced to turn to the charity of family and of friends. Both men were forced at middle age to engage in manual labor, with its attendant stresses, to support themselves.

In addition to these stresses, Hovater and Hurlbut were denied the opportunity to engage in a business which had been described by Gulf Atlantic as being highly profitable. Both Hovater and Hurlbut stated that Gulf Atlantic represented to them that trusts of the type they had planned to implement were capable of earning a hundred to a hundred and fifty thousand dollars a year. If Hovater and Hurlbut had worked ten years under the original agreement of 1974, they could have

each earned an income of at least $750,000 for this period.

Gulf Atlantic contends, however, that it is improper to use the representation of potential income in calculating damages. In Gulf Atlantic's view, the figure is too speculative to form a basis for calculating damages. Under other circumstances I might agree, but because Gulf Atlantic made representations concerning sums in excess of these to induce Hurlbut and Hovater to join in this venture with them, Gulf Atlantic should be bound by those sums and the jury should be able to use those sums in calculating damages.

Finally, Gulf Atlantic contends that the jury did not follow the evidence in reaching its verdict. In this respect, Gulf Atlantic argues that because the jury awarded the amount of actual damages requested by Hovater's and Hurlbut's attorneys and, because the jury awarded the same amount of damages each to Hovater and Hurlbut, the jury's conduct was improper. It cannot be presumed that the jury acted improperly because they found damages as requested by the plaintiffs. Damages, such as mental anguish and injury to reputation, are highly subjective. The fact that the jury used that which the parties requested as a guidepost in assessing damages is hardly surprising. Furthermore, I cannot sanction a rule that a presumption of misconduct arises merely because the jury assessed damages in accordance with the request of the plaintiff. Neither can I presume misconduct because the jury awarded the same sum of damages to each party. Many factors may have contributed to the manner in which the jury assessed damages. For example, the jury may have thought one party was entitled to more than $1,200,000 but limited him to that sum because that is the sum which he requested. This is just one of the many explanations, other than jury misconduct, which could account for the jury's method of assessing damages.

## STATUTE OF LIMITATIONS

Gulf Atlantic also asserts as an affirmative defense that plaintiffs' causes of action for their tort claims for fraud, conspiracy, business disparagement, and malicious interference with contractual relations are barred by the applicable statutes of limitations. Since suit was filed by plaintiffs on January 21, 1977, Gulf Atlantic asserts that the primary question is whether Hurlbut and Hovater had knowledge before the meeting with Flanary on January 21, 1975, that Gulf Atlantic's misrepresentations to plaintiffs were false. The material misrepresentations in this case were: (1) that all necessary approvals had been obtained and, therefore, plaintiffs were legally authorized to sell group health insurance under the master policy; and (2) that defendants intended to underwrite the group health insurance policy which plaintiffs agreed to sell. I would hold that none of plaintiffs' causes of action were barred because there is evidence that Hurlbut and Hovater did not have knowledge that defendants did not intend to underwrite the policy before January 21, 1975, and that evidence exists to support the jury's finding that they could not have discovered such lack of intent by the exercise of reasonable diligence.

In fraud cases, limitations begin to run from the time the fraud is discovered or could have been discovered *by the defrauded party* by the exercise of reasonable diligence. *Estate of Stonecipher v. Estate of Butts*, 591 S.W.2d 806 (Tex.1980). As the supreme court explained in *Ruebeck v. Hunt*, 142 Tex. 167, 176 S.W.2d 738 (1943), the question of whether the plaintiff had exercised a proper degree of diligence to discover the fraud is usually one of fact for the jury. Accordingly, this court is bound by the jury's negative answer to Special Issue No. 27 if there is competent evidence to support it:

Do you find from a preponderance of the evidence that the plaintiffs knew or by the exercise of ordinary care should have known of *the fraud,* if any, of the defendants on or before January 20, 1975? [emphasis added]

Gulf Atlantic argues that the special issue should have been phrased in terms of whether a "reasonably prudent person" could have discovered the fraud through a reasonable inquiry, citing *Steele v. Glenn*, 57 S.W.2d 908, 913 (Tex.Civ.App.—Eastland 1933), *writ dism'd w.o.j., per curiam sub. nom. Glenn v. Steele*, 141 Tex. 565, 61 S.W.2d 810 (1933). I note, however, that although in *Steele* the Court of Civil Appeals stated that the issue was not whether plaintiff exercised reasonable diligence to discover the fraud, 57 S.W.2d at 913, the supreme court, in denying review, was at pains to write a per curiam opinion stating that fraud prevents the finding of limitations "until discovered, or by reasonable diligence might have been discovered." Whether the question is stated in terms of failure of the defrauded party to use reasonable diligence (or ordinary care) to make inquiry, in view of the facts known to him, or in terms of whether an ordinary prudent person with such knowledge would have made an inquiry which would have led to discovery of the fraud, the controlling standard of conduct is the same. *See Wise v. Anderson*, 163 Tex. 608, 354 S.W.2d 876 (1962). Essentially the same question was submitted by special issue number 27. Whether the defrauded party had knowledge of facts that would have prompted a person of ordinary prudence to make an inquiry which would have led to discovery of the fraud is an evidentiary matter bearing on this ultimate issue and, in my view, need not be expressly included in the issue or in an accompanying instruction. Consequently, I would hold that the trial court did not err in submitting special issue number 27 or in denying defendants' requested issue.

Furthermore, ample evidence exists to support the jury's negative answer to this issue. Plaintiffs' evidence shows that both plaintiffs were repeatedly assured that there were no insurmountable problems in obtaining approval of the master insurance policy and that Gulf Atlantic would secure the necessary approval and follow through with underwriting the policy. Jack Warner, the vice-president of Nationwide Corporation in charge of supervision of Gulf Atlantic, assured plaintiffs that nothing was amiss with the master policy as late as January 21, 1975, shortly before the Attorney General took the plaintiffs into custody. Consequently, it does not matter if, as defendants contend, plaintiffs judicially admitted in their pleadings that they knew in late 1974 that the insurance board had not approved the master policy. The question is not merely whether plaintiffs knew that the policy lacked approval; the question is whether plaintiffs also knew so much that they should have discovered that defendants did not intend to secure the necessary approval and proceed to underwrite the policy. Sufficient evidence existed to support the jury's finding on this question.

The cases discovered through my research are not to the contrary. In *Phillips v. Baker*, 114 S.W.2d 421 (Tex.Civ.App.—San Antonio 1938, writ ref'd), the plaintiff's failure to bring suit within the time required by the statute of limitations was not excused by the fact that defendants had repeated to him their fraudulent promises after plaintiff had discovered the fraud. The evidence showed, however, that plaintiff had not relied upon the repeated promises. Reliance on the repeated fraudulent statements was present in *Stafford v. Wilkinson*, 157 Tex. 483, 304 S.W.2d 364 (Tex. 1957). The supreme court held that the plaintiff's failure to bring suit within the time required by the statute of limitations was not excused simply because, after plaintiff had learned the true facts, defendants repeated to him fraudulent statements which were merely repetitions of the original representation. *See also Frownfelter v. International Shoe Co.*, 273 F.2d 338 (5th Cir.1960). The rule of these cases does not apply, however, to the case at bar because two distinct representations were made to Hurlbut and Hovater. The evidence showed that after plaintiffs discovered that all necessary approvals for the master policy and trust arrangement had in fact not been obtained, defendants made a second representation to plaintiffs—that Gulf Atlantic intended to follow through

with underwriting the policy—which was not a mere repetition of the original representation.

Neither is plaintiffs' tort claim for business disparagement barred by limitations. The majority accepts Gulf Atlantic's contention that the claim of "disparagement of trade or calling" is actually a libel claim barred by a one-year statute of limitations. As discussed *supra,* I do not agree. Business disparagement was first recognized in *Brown v. American Freehold Land Mortgage Company of London,* 97 Tex. 599, 80 S.W. 985 (1904), wherein the supreme court distinguished this cause of action from that of libel or slander. That court held that the two-year, rather than the one-year libel statute of limitations applied to a business disparagement action. Nevertheless, defendants have cited this court's decision in *Moore and Associates v. Metropolitan Life Insurance Co.,* 604 S.W.2d 487, 491 (Tex.Civ.App.—Dallas 1980, no writ) in which it was held that the plaintiff doctors' claim of interference with the physician-patient relationship was based on the false and defamatory character of the communication complained of, and, therefore, was indistinguishable from a claim for libel. In that case, however, the complained of statements were inherently defamatory (libelous or slanderous *per se* ). The present case is consequently distinguishable, since defendants' false statements to third persons that Gulf Atlantic had not authorized plaintiffs to write group health insurance were not inherently defamatory, even though the consequences of those statements may have included injury to plaintiffs' reputation as well as interference with their business relationships. Thus, because defendants denied any relationship with plaintiffs on and after January 21, 1975, the business disparagement action in this case is not barred by limitations.

I note, finally, that defendants failed to request special issues on limitations regarding the conspiracy and tortious interference with contract actions and, because there was conflicting evidence on the accrual of these actions, defendants waived the limitations defense as to these actions.

*Marburger v. Jackson,* 513 S.W.2d 652, 655 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.). Inasmuch as the jury's findings on these actions are sufficient to warrant the judgment's award of damages, I would not reverse on a claim of limitations.

## MALICE AND PUNITIVE DAMAGES

Appellants next complain of the award of punitive damages and of the jury findings of malice with respect to each of plaintiffs' causes of action. Gulf Atlantic argues that there is no evidence or insufficient evidence to support the findings of malice. With respect to the award of punitive damages, Gulf Atlantic argues that the award of exemplary damages in the amount of $5,250,001.00 for each plaintiff exceeds the amount of exemplary damages alleged in plaintiffs' petition, and that it was error to submit and to assess punitive damages against each defendant separately. I cannot agree with these contentions.

The general rule is that to support an award of punitive damages the act complained of must partake of a wanton or malicious nature and it is not sufficient that the act be merely unlawful or wrongful. *Ware v. Paxton,* 359 S.W.2d 897, 899 (Tex.1962); *Woo v. Great Southwestern Acceptance Corp.,* 565 S.W.2d 290, 299 (Tex.Civ.App.—Waco 1978, writ ref'd n.r. e.). Punitive damages may also be recovered, without showing actual malice, where the defendant's acts are accompanied by fraud. *Clements v. Winters,* 437 S.W.2d 818, 822 (Tex.1969); *Connor v. Sewell,* 90 Tex. 274, 38 S.W. 35 (Tex.1896); *Woo,* 565 S.W.2d at 299. In this case, the record contains ample evidence that defendants' actions toward plaintiffs were intentional and without justification or excuse, as set forth, *infra* and *supra.*

Neither can I agree with Gulf Atlantic's contention that the issue as to punitive damages should not have been submitted separately as to each defendant. *See Schutz v. Morris,* 201 S.W.2d 144 (Tex.Civ. App.—Austin 1947, no writ). In *St. Louis & S.W. Ry. Co. of Texas v. Thompson,* 102

Tex. 89, 113 S.W. 144 (1908), the supreme court stated:

> [I]f the defendants or either of them were actuated by malice ... then the plaintiff may ... recover exemplary damages against either or all of the said defendants. It is not necessary, as in the case of actual damages recovered, that all of the defendants should be subject to the same verdict because some of the defendants may have acted without malice, ... and as to such defendants there would be no right to recover exemplary damages.

This language was quoted in *Walker v. Kellar,* 226 S.W. 796 (Tex.Civ.App.—San Antonio 1921, *writ ref'd*), to support that court's holding that the question of exemplary damages as to each defendant should go to the jury. The criteria used in setting the amount of punitive damages [5] demand individual assessment by the jury of each defendant's conduct, situation, sensibilities, and culpabilities. *Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149 (5th Cir.1982). Consequently, I would hold that the trial court correctly submitted the issues separately and the jury properly assessed punitive damages in its verdict as to each defendant separately, rather than assess punitive damages jointly and severally against all defendants.[6]

Gulf Atlantic next argues that the judgment awards punitive damages in excess of that alleged in plaintiffs' petition. In this respect, plaintiffs alleged that they were "entitled to recover exemplary damages in the sum of Three Million Six Hundred Thousand Dollars ($3,600,000.00) each, against the Defendants herein, jointly and severally." The jury assessed exemplary damages as follows:

(1) $3,000,000.00 against Gulf Atlantic Life Insurance Co.

(2) $2,000,000.00 against Nationwide Corp.

(3) $100,000.00 against William F. Barnes

(4) $100,000.00 against Kenneth Thompson

(5) $50,000.00 against Jack G. Warner

(6) $1.00 against William Smith

Thus, $5,250,001.00 is the total amount awarded by the jury for each plaintiff. TEX.R.CIV.P. 301 provides:

> The judgment of the court shall conform to the pleadings, the nature of the case proved and the verdict ... and shall be so framed as to give the party all the relief to which he may be entitled either in law or *in equity.* [emphasis added]

Plaintiffs contend that the pleadings are adequate to support this judgment. I do not agree. As I read plaintiffs' pleadings, the "each" with respect to $3,600,000.00 refers to each plaintiff rather than to each defendant.

Nevertheless, in their motion for judgment on the jury's verdict, plaintiffs asserted that their pleadings as to exemplary damages were sufficient but, in the alternative, they moved the trial judge as follows:

> In the alternative, if such pleading is not fully sufficient to support a judgment in the amount of the verdict found by the jury, the court should now grant plaintiffs permission to amend their pleadings after the verdict and before judgment to specifically include all amounts found by the jury in response to special issues.

Since the petition, as I construe it, is inadequate to support the judgment, I conclude that the trial judge granted plaintiffs the trial amendment contained in the motion for judgment. *See Jones v. State,* 644 S.W.2d 546 (Tex.App.—Dallas 1982) (*en banc*) (appellate court presumes in favor of trial judge's actions where record is silent), *pet. ref'd,* 646 S.W.2d 449 (Tex.Crim.App. 1983) (*en banc*) (expressly approving hold-

---

**5.** *See Southwestern Investment Co. v. Neeley,* 452 S.W.2d 705 (Tex.1970); *Ledisco Financial Services v. Viracola Inc.,* 533 S.W.2d 951 (Tex.Civ.App.—Texarkana 1976, no writ); *Schutz v. Morris,* 201 S.W.2d 144 (Tex.Civ.App.—Austin 1947, no writ).

**6.** *See* concurring opinion of Justice Kilgarlin in *Akin v. Dahl,* 661 S.W.2d 917, 922 (Tex.1983).

ing that a presumption of regularity of trial judge's rulings prevail).

In any event, error, if any, was harmless. Post-verdict trial amendments to increase the amount of exemplary damages alleged to comport to the amount found by the jury have been allowed, *e.g., Irwin v. Whirley,* 538 S.W.2d 150 (Tex.Civ.App.—Waco 1976, no writ). Trial amendments after verdict have been allowed to make the pleadings conform to the jury's verdict in various situations. *Santa Rosa Medical Center v. Robinson,* 560 S.W.2d 751 (Tex.Civ.App.— San Antonio 1977, no writ) (actual damages); *Ward v. Shriro Corp.,* 579 S.W.2d 257, 262 (Tex.Civ.App.—Dallas 1978, no writ) (exemplary damages); *American Produce & Vegetable Co. v. Campisi's Italian Restaurant,* 533 S.W.2d 380 (Tex. Civ.App.—Tyler 1975, writ ref'd n.r.e.) (theory of recovery); *Tom's Toasted Peanuts, Inc. v. Doucette,* 469 S.W.2d 399 (Tex.Civ. App.—Beaumont 1971, writ ref'd n.r.e.) (actual damages); *Shaw v. Tyler Bank & Trust Co.,* 285 S.W.2d 782 (Tex.Civ.App.— Texarkana 1955, writ ref'd n.r.e.) (affirmative defenses). Conversely, the supreme court has held that a trial judge abused his discretion in refusing to permit an amendment conforming the pleadings to the jury's verdict. *Vermillion v. Haynes,* 147 Tex. 359, 215 S.W.2d 605, 609 (1948).

The trial court's action in implicitly granting the trial amendment did not prejudice the defendants, since it did not contravene the rationale of Rule 301. The requirement that the judgment conform to the pleadings is based on the rationale that the defendant is entitled to notice of that which the plaintiff intends to prove. *E.g. Mims v. Mitchell,* 1 Tex. 443, 447 (1846). The rationale of notice has no application to pleadings for exemplary damages because notice to the defendant is not a consideration with respect to preparing his defense to plaintiff's pleading. Instead, exemplary damages are to be determined by the fact finders within their sole discretion predicated upon consideration of the sums necessary to protect the public and of the sums necessary to penalize each defendant based upon each defendant's degree of culpability

so as to deter that specific defendant from committing future similar acts. In essence, exemplary damages are discretionary with the fact finder and are in the nature of a punishment to each defendant. Consequently, the rationale behind the doctrine that a plaintiff is limited to the sum pleaded as actual damages has no application to exemplary damages. Apart from this reason, to hold to the contrary would be to place form over substance and would be contrary to Rule 301. *See Minexa Arizona, Inc. v. Staubach,* 667 S.W.2d 563 (Tex.App.—Dallas 1984, no writ) (condemning antiquated form pleading). Accordingly, I would hold that the trial judge did not abuse his discretion in granting judgment upon the jury's verdict with respect to exemplary damages.

## FAILURE TO PERFECT BILL OF EXCEPTIONS AS TO ATTORNEY ALLEN

Gulf Atlantic contends that the trial court erred in failing to require Ira Lee Allen, an attorney, to testify with respect to conversations with plaintiffs because the attorney-client privilege claimed on behalf of plaintiffs "did not apply or had been waived." I would hold that Gulf Atlantic has failed to preserve error. Gulf Atlantic attempted to elicit testimony from Allen which referred to conversations which Allen had with Hovater and Bengel, who was Agency Associates' office manager. Hurlbut and Hovater objected to these questions, claiming that they were privileged communications between attorney and client. The objection was sustained. Gulf Atlantic was later given an opportunity by the trial court to perfect a bill of exceptions on the excluded testimony. Hurlbut and Hovater requested, however, that Allen not be required to answer Gulf Atlantic's questions in open court. The only way the privilege could be protected, Hovater and Hurlbut asserted, would be for Allen to answer Gulf Atlantic's questions *in camera.* The trial judge afforded defendants this opportunity but Gulf Atlantic refused to perfect its bill under these conditions.

On appeal Gulf Atlantic contends that Allen was actually the attorney for both Gulf Atlantic and the plaintiffs and, alternatively, that by the admission of certain documentary evidence and testimony, Hurlbut and Hovater had waived their right to assert an attorney-client privilege. Because Gulf Atlantic has, by its refusal to perfect a bill of exception, failed to preserve error, I do not reach these contentions. The conditions placed by the trial judge upon the bill of exception were not so onerous as to deny Gulf Atlantic the opportunity to preserve error. Even if Gulf Atlantic declined to receive Allen's answers *in camera,* at least Gulf Atlantic could have preserved the questions which it wished to ask Allen. Without the questions which Gulf Atlantic wished to ask, I am unable to ascertain the relevance of the excluded testimony. Neither can it be determined whether the exclusion of this evidence harmed Gulf Atlantic. Indeed, the excluded but unknown testimony may have been cumulative of evidence previously adduced. In any event, there is nothing in the record from which it can be determined whether the trial judge's actions were correct or incorrect. Consequently, no reversible error is presented. *Dallas Oil & Gas, Inc. v. Mouer,* 533 S.W.2d 70, 80–81 (Tex. Civ.App.—Dallas 1976, no writ).

## VOIR DIRE AND JURY ARGUMENT

Appellants assert that the trial court erred by overruling their objection to plaintiffs' final argument and, consequently, advising the jury of the effect of their answer to special issue 27, which reads:

Do you find from a preponderance of the evidence that the Plaintiffs knew or by the exercise of ordinary care should have known of the fraud, if any, of the Defendants on or before January 20, 1975?

The argument objected to was:

MR. AYRES: Now, we'll go through those issues with you in a general way, and suggest to you how we think they should be answered, but I want to go to the last issue in the Court's Charge first, because to me, that is the issue, if I was on the jury, I would want to know about first, and that is this issue about when the Defendants—pardon me, when the Plaintiffs knew or should have known about the fraud of the Defendants. The Court asks you a very important question there and there is nothing that the Defendants would like better, regardless of your answers to every other issue in the Charge—

MR. COUSINS: Your Honor please, he is telling the jury the effect of their answer and we object to it.

THE COURT: Overrule the objection.

MR. AYRES: There is nothing that the Defendants would like better, ladies and gentlemen, than for you to come in with a verdict that the people of Dallas County can be proud of and then on that last issue answer "We do."

MR. COUSINS: Your Honor again, he is instructing the jury, telling them the effect of their answer, we ask that you instruct him to not make that kind of an argument, that is exactly what he is doing.

THE COURT: Well, you better argue the evidence or your position on that issue and not directly referring to—

MR. COUSINS: He is saying what I would like or not like, Your Honor, that is my problem.

THE COURT: All right. Tell them what you would like them to do.

MR. AYRES: Ladies and Gentlemen, we think the evidence in this case, justifies one answer, "We do not." It is a kind of a tragedy to to get into the national championship and fumble right on the goal line, isn't it? That is what you will do if you will answer that question "We do."

MR. COUSINS: Your Honor please, we move for a mistrial, the man obviously is telling the jury the effect of their answer, he is deliberately avoiding the Court's ruling.

THE COURT: Overrule the objection.

Although I agree that the "goal-line fumble" argument was error, *Cf. Hurley v. McMillan,* 268 S.W.2d 229, 233 (Tex.Civ.

App.—Galveston 1954, writ ref'd n.r.e.), nevertheless, the error is harmless. After an examination of the evidence relevant to special issue 27, the appellant has failed to show the probability that the verdict was the result of this improper argument rather than the evidence in this record. *See Standard Fire Insurance Company v. Reese*, 584 S.W.2d 835, 840 (Tex.1979). Consequently, appellants' contention lacks merit.

Next appellants complain of a jury argument which they contend appealed to the jury's sympathy and bias through stressing the financial disparity of the parties. I need not address the precise argument made because no objection based on this ground was made to the trial court and thus error, if any, is waived. *Houston & T.C. Ry. Co. v. Terrell*, 69 Tex. 650, 7 S.W. 670 (1887). Likewise, appellants object to a jury argument which repeatedly urged the jurors to put themselves in the plaintiffs' position. Again I need not discuss the precise argument made because the trial court sustained appellants' objection and no further relief was requested.

Appellants also argue that the plaintiffs' opening statement referred to certain immaterial yet highly prejudicial matters. The record reveals that plaintiffs' counsel stated his belief that the evidence would show that Gulf Atlantic attempted to bribe a public official, to which an objection was made and sustained. No further relief was requested. Under such circumstances, error, if any, is cured. *Armellini Express Lines of Florida, Inc. v. Ansley*, 605 S.W.2d 297, 305 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.). Plaintiffs' counsel next claimed that "a conspiracy was formed and carried out ... to stonewall the investigation of the Attorney General's office and the appropriate criminal officials of the State of Texas." Objection was made that these matters were not within the pleadings, but was overruled. Because the plaintiffs had alleged and the evidence showed that Gulf Atlantic had given false information to the Attorney General's office, the objection was properly overruled.

## JURY MISCONDUCT

Gulf Atlantic contends that "the trial court erred in failing to grant defendant's motion for new trial on the grounds of jury misconduct as established by the testimony." The basis of Gulf Atlantic's argument is that certain jurors related personal experiences during the jury's deliberations. Because it appears that Gulf Atlantic probably did not suffer harm by any misconduct which may have occurred, I would overrule Gulf Atlantic's contention.

Under TEX.R.CIV.P. 327, in order to prevail in a motion for new trial on the basis of jury misconduct, a movant has the burden to prove that (1) misconduct occurred; (2) it was material misconduct; and (3) based on the record as a whole, the misconduct probably resulted in harm to them. *Flores v. Dosher*, 622 S.W.2d 573, 574 (Tex. 1981); *Strange v. Treasure City*, 608 S.W.2d 604 (Tex.1980). In a hearing on a motion for new trial, the trial judge acts as the fact finder. Thus, if there is evidence to support his findings of fact, his findings are conclusive on whether jury misconduct occurred or whether the complainant was harmed. *Flores*, 622 S.W.2d at 575. Consequently, this court disregards a finding which is contrary to the conclusive evidence or which has no support in the evidence. Whether the misconduct was material or probably harmed the movant is a matter of law which is open to this court's full inspection.

The alleged acts of misconduct in this case occurred while the jury was deliberating on the issue of actual damages. Hurlbut and Hovater testified at trial that if their arrangement with Gulf Atlantic had come to fruition, they would have earned a hundred to a hundred and fifty thousand dollars a year. On motion for a new trial, a juror named Maahs testified to three instances where other jurors had related personal experiences during deliberations. The first comment which Maahs related was allegedly made by Jack Jeffers, who was foreman of the jury. According to Maahs, Jeffers stated that he had a neigh-

bor who was an insurance agent and that this neighbor made in excess of eighty thousand dollars a year. Second, Maahs related that a juror named Clarence stated that he had at one time been an insurance agent and "it was not unusual for an agent to be making eighty to one hundred thousand dollars a year." Finally, Maahs stated that a brief comment was made concerning what the sale value of an insurance agency would be if Hurlbut and Hovater had decided to retire. The next juror to testify at the hearing on the motion for new trial was Jack Jeffers, the jury's foreman. He stated that he did at one time have a neighbor, who was also a good friend and who was in the insurance business, and that the neighbor's earnings had increased after his probationary period ended. In addition, Jeffers stated that he told the jury that it would be possible for an insurance agent to earn the amount which Hovater and Hurlbut testified they had anticipated earning. He also testified that he had stated that in his opinion an insurance agent could make seventy to eighty thousand a year, but that he did not know anyone who had earned such an amount. Jeffers could not recall that a juror named Clarence made a statement as to the income of an insurance agent. Neither could he recall a statement relating to the sale value of an insurance agency. The next witness was a juror named Sherie Nolin. Nolin recalled that Jeffers had stated that he knew someone who was an insurance agent and that she thought Jeffers said that this person made a substantial sum of money. She could not remember the juror named Clarence making a statement relating to insurance agents.

At the conclusion of the hearing, the trial court made the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1.

During the discussion on the issue of actual damages, the Jury was considering testimony of Mr. Hurlbut and Mr. Hovater that they had been told by the Defendants that they could expect to make between $100,000.00 and $150,000.00 per year under the insurance program of the Defendants. During this discussion Juror, Jackie Jeffers, stated in effect that it was his opinion that earnings of $70,000.00 or $80,000.00 per year would not be unusual.

2.

This statement was made as an opinion and at a time when the Jury was considering the testimony of Hurlbut and Hovater. Said statement was not made as an expression of fact.

3.

No other statements concerning earnings of agents were made by any juror except those based on the evidence produced at the trial.

### CONCLUSION OF LAW

1.

A discussion of credibility of Plaintiff's testimony of expected earnings of $100,000.00 to $150,000.00 per year under Defendants' insurance plan was consistent with the Court's inquiry concerning actual damages and, therefore, the Juror's expression of an opinion on the issue was not misconduct in this context.

2.

Such expression of opinion was not material in the decision rendered by the Jury.

3.

That based on the record as a whole, the expression of an opinion by the Juror, Jackie Jeffers, did not result in probable harm to the Defendants.

4.

Defendants failed to meet the burden required by Rule 327, Texas Rules of Civil Procedure.

It must first be determined whether the trial court's findings of fact are supported by the evidence. With respect to the findings, all three jurors testified that Jeffers, the foreman, stated that he was acquainted with a person who was an insurance agent and that Jeffers made at least some reference to this individual's earnings. Admittedly, the jurors did not agree that any sum of money was mentioned as to the individual's earnings. This expression of fact was made in addition to the comment by Jeffers that in his opinion, it was possible for an insurance agent to make $70,000 or $80,000 a year. I do agree, however, that the trial court had a basis to conclude that juror Clarence did not state that he had been an insurance agent and that he had made a certain amount of money in the profession and that there had been no discussion of the possible sale value of an insurance agency. Both jurors Jeffers and Nolin stated that they could not recall the comment in question allegedly made by Clarence. Juror Jeffers stated that he could not recall a comment on the sale value of an insurance agency. Due to this conflict, this court is bound by the trial court's finding that these statements did not occur. *Flores,* 622 S.W.2d at 575.

First, my review of the record indicates that the trial court was correct in finding no instance of jury misconduct other than Jeffer's comments about the income of insurance agents. Second, I would conclude, as the trial court did, that these comments did not result in an improper verdict because the evidence at trial established sums far in excess of Jeffers' estimate of an insurance agent's annual income.

Accordingly, I would hold that, based on the record as a whole, Gulf Atlantic was not likely harmed by the misconduct of juror Jeffers. There was testimony of a much higher earning potential by Hovater and Hurlbut. Additionally, the comments of only one juror were involved and at least a part of his comments were expressed in the form of an opinion. Consequently, I would hold that the injection of personal knowledge by Jeffers, although improper, does not require reversal of this case.

I would affirm the judgment of the trial court.